UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 11 CR 918 |
| | ) | Judge Elaine Bucklo |
| | ) | |
| McKENZIE CARSON | ) | |

## McKENZIE CARSON'S SENTENCING MEMORANDUM

Defendant McKenzie Carson ("Carson") submits this memorandum in support of his request for a sentence below the advisory guideline range.

McKenzie Carson suffers from Bipolar I Disorder - a victim of a chronic, serious and debilitating mental disease. He was certainly suffering from this serious disorder at the time of the offense of conviction. And he has probably been suffering from bipolar disease - and the confusion, depression, lack of insight and judgment, and the failure to control the destructive impulses that come with the disease – for most of his life, which potentially sheds some light on the reasons for his troubling past.  In retrospect, there were definite signs of Carson's mental illness in the past, but a definitive diagnosis was only recently made after he was arrested in this case and subsequently examined and diagnosed by Dr. Stephen Dinwiddie, professor of psychiatry at Northwestern University's Department and

1

Psychiatry and Behavioral Sciences. Finally, Carson can now get treatment for the illness he now knows he has, and find a way to control the "dark passenger" of mental illness that has partly controlled his actions for much of his life.

Carson now comes before this Court fully expecting to be sentenced to a period of incarceration for his serious criminal conduct. The mandate provided by Title 18, United States Code, Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing: just punishment, retribution, deterrence and rehabilitation. Taking into consideration all relevant sentencing factors, including Carson's personal history, his serious mental illness and the role his illness has played in his life and criminal conduct, and the fact that the diagnosis of his illness will most likely lead to effective psychiatric treatment that can quell Carson's future mood disorders, manic episode and criminal impulses, a just and fair punishment for McKenzie Carson is 180 months in prison, with a strong recommendation of intensive, on-going psychiatric treatment and therapy.

## I. The Advisory Guidelines in the Presentence Investigation Report ("PSR") and Carson's Objections to the Guideline Caculations

### A. PSR's Advisory Guideline Calculations

### 1. Separate count calculations

First, the guideline calculations were calculated individually for each of the four counts of the indictment and or the one instance of relevant conduct. The PSR calculates the five offense levels as follows:

**a. Count 1, Victim 1: total offense level of 40**

i.    Base offense level of 34

ii.    2 level enhancement pursuant to § 2G1.3(b)(2)(B) unduly influencing a minor.

iii.    2 level enhancement pursuant to § 2G1.3(b)(3)(B) for use of a computer.

iv.    2 level enhancement pursuant to § 2G1.3(b)(4)(A) because the offense involved the commission of a sex act.

**b. Count 2, Victim 2: total offense level of 36**

i.   Base offense level of 34

ii.   2 level enhancement pursuant to §3A1.1(b) vulnerable victim

**c. Count 3, Victim 3: total offense level of 36**

i.    Base offense level of 34

ii.   2 level enhancement pursuant to §3A1.1(b) vulnerable victim

**d. Count 4, Victim 4: total offense level of 36**

i.    Base offense level of 34

ii.   2 level enhancement pursuant to §3A1.1(b) vulnerable victim

**e. Relevant Conduct, M. Hurley; total offense level of 34**

i. Base offense level of 34

## 2. Grouping of counts and resulting offense level

Pursuant to §3D1.3 and §3D1.4, the combined offense level is determined by taking the highest offense level from the relevant counts and increasing the offense level by the number of "units" as indicated in §3D1.4. The PSR calculates the highest offense level to be 40 and the number of units as 4, for a combined adjusted offense level of 44.

## 3. § 4B1.5(b)(1) enhancement and the Total Adjusted Offense Level

Pursuant to § 4B1.5(b)(1), 5 levels are added if the defendant is convicted of a "covered sex crime" and engaged in a pattern of activity involving prohibited sexual conduct. Application note 2 states that a "covered sex crime" includes crimes under 18 U.S.C. § 1591. The 5-level increase results in a total adjusted offense level of 49. Because the Sentencing Table only goes up to offense level 43, the PSR adjusts Carson's final offense level to a level 43.

## 4. Criminal History Category and Final Advisory Sentencing Range

The PSR concludes that Carson 5 criminal history points and therefore is a criminal history category of III. A criminal history category of III and total offense level of 43 results in a sentencing range of life imprisonment.

4

### B. Carson's Objections to the PSR's Guideline Calculations

Carson objects to the following advisory guideline calculations to his offense level contained in the PSR:

**1. Objection to the two-point enhancement to Carson's offense level based on the finding that Carson used a computer to encourage or solicit customers to engage in prohibited sexual conduct with Victim 1**

Carson objects to the PSR enhancing his offense level by 2 levels pursuant to Guideline § 2G1.3(b)(3)(B) because he used a computer to encourage or solicit customers to engage in prohibited sexual conduct with Victim 1. The evidence in this case shows that Carson did not use a computer or internet device to solicit customers for Victim 1.

Guideline 2G1.3(b)(3) provides that "if the offense involved the use of a computer or an interactive computer to . . . entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, increase by 2 levels." Section 2G1.3(b)(3)(B). Application note 4 to that section states that "subsection (b)(3) is intended to *apply only to the use of a computer or an interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor.* (emphasis added).

In *United States v. Patterson*, 576 F.3d 431, 444 (7th Cir. 2009), the Seventh Circuit held that the "use of a computer" enhancement under §2G1.3(b)(3) did not

5

apply where an adult advertised a minor for commercial sex services on the internet. In *Patterson*, the government conceded that the enhancement did not apply. Further, the Seventh Circuit rejected the enhancement because "in this case, no computers were used to 'communicated directly' with the victim or the victim's custodian, so the enhancement does not apply." *Id.*

This case is nearly identical to *Patterson*. Both cases involved defendants using the internet to offer prostitution of a minor. The "use of a computer" enhancement did not apply in *Patterson* and it should not apply here.

The PSR notes that the government recommends the application of the two-point enhancement under §2G1.3(b)(3) because Carson used a cell phone to facilitate the minor's travel to and from prostitution dates, and a cell phone meets the definition of computer under the guidelines. The PSR did not use the government's "cell phone is a computer" argument as a basis for its 2-level increase pursuant §2G1.3(b)(3), and this Court should similarly reject the government's argument.

The government, in its sentencing memorandum advocating for the enhancement, cites to *United States v. Kramer*, 631F.3d 900 (8th Cir. 2011), which upheld the district court's decision to apply U.S.S.G. § 2G1.3(b)(2)(A) to a defendant who used his cell phone to make voice calls and send text messages to the minor victim for a six month period leading up to the commission of the offense of transporting a minor in interstate commerce with the intent to engage in criminal

6

sexual activity with her. In doing so, the court held that the definition of a computer found in 18 U.S.C. § 1030(e)(1) is extremely broad, even including a basic cell phone used only to make phone calls and send voice messages.

*Kramer,* an 8th Circuit case*,* was wrongfully decided and should not be relied on. First, cell phones are used by virtually every adult in this country, so if the enhancement applies to all use of a cell phone, regardless of whether the cell phone is actually being used as a computer, then the enhancement would apply to virtually every offender.

Second, while the extremely broad definition of "computer" applied by *Kramer* may possibly include the use of a smart phone with internet capability, to apply the enhancement to a cell phone used only for making phone calls would result in unwarranted and nonsensical sentencing disparities. For example, an offender who entices his victim from a cell phone without internet capability would be subject to the enhancement, while an offender who uses a land line phone to persuade, induce, entice, coerce, or facilitate the travel of his victim, would not. Both offenders used a telephone to accomplish the same wrongful act. Both should be treated the same under the guidelines.

Third, even if *Kramer* was correctly decided, it is factually distinguishable from the instant case. In *Kramer*, the defendant was exactly the type of offender targeted by Congress. He was using the phone to seduce or convince the minor to meet him

7

for sex, albeit not through the internet, which is the type of conduct that the computer enhancement was specifically designed to deter.1 In this case, Carson was not using his cell phone to seduce the minor to travel in interstate commerce, and the use of the phone to make local calls to a minor who was already associating with the defendant was not the type of anonymous or secretive internet communication to which the computer enhancement was enacted to punish. Therefore, the enhancement should not be applied to fact patterns such as here – where a cell phone was used only to make phone calls and send voice messages.  In sum, there should be no 2-point enhancement to Carson's offense level pursuant to § 2G1.3(b)(3)(B).

**2. Objection to the 2 - point increase to Carson's offense level for Count 1
because the offense involved the commission of a sex act or sexual conduct**

Carson also objects to the PSR's 2-point enhancement of his base offense level pursuant to Guideline 2G1.3(b)(4)(A)  for "successfully coercing Victim 1 to engage

---

1 The U.S.S.G. § 2G1.3(b)(2) enhancement was added in response to the Child Protection and Sexual Predator Punishment Act of 1998, Pub.L. No. 105-314, 112 Stat. 2974, which addressed the problem that cyberspace provides an increasingly common and effective medium by which would-be predators can contact minors, or persons in control of minors, to arrange for sexual encounters. *United States v. Robertson*, 350 F.3d 1109, 1113 (10th Cir. 2003). The authors of this act were concerned about the ability of predators, acting anonymously, to directly seduce children with little risk of detection. *See*, Commentary recited in *Robertson*, *Id.*, at 1113-1114. To counter these evils, the 1998 act (among other things), directed the Sentencing Commission to impose harsher penalties on sexual criminals who used computers. *Robertson*, *Id.*, at 1114.

in commercial sex acts on several occasions." PSR, paragraph 39. This enhancement is not applicable in this case.

U.S.S.G. §2G1.3(b)(4) states that, "If (A) the offense involved the commission of a sex act or sexual contact; or (B) subsection (a)(3) or (a)(4) applies and the offense involved a commercial sex act, increase by 2 levels." Subsection (B) only applies where the defendant is convicted of enticement of a minor (§2G1.3(a)(3)) or transportation of a minor (§2G1.3(a)(4)), so subsection (B) is inapplicable to this case. Carson's position is that subsection (A) is also inapplicable because it only applies in cases where the defendant engages in a *non-commercial* sex act with a minor as part of the offense.

The language of subsection (A) calls for a 2-level enhancement where the offense involved "the commission of a sex act or sexual contact." This enhancement would apply to all of the sex crimes listed in § 2G1.3, including trafficking in minors, enticement of minors, and transportation of minors. The enhancement under (A) must only apply where the defendant actually engages in  noncommercial sex act with the minor in the course of the offense. If (A) also applied to commercial sex acts, then the enhancements under both (A) and (B) would apply to defendants convicted of transportation or enticement crimes involving prostitution where the defendant commits a commercial sex act with the minor. The result would be that the defendant would receive a 2-level enhancement under (A) and a 2-level

9

enhancement under (B) for the exact same conduct (commercial sex with a minor). That is clearly not the intended result of the guidelines. Indeed, the two sections deliberately distinguish between the type of sex acts to which they apply – (A) refers to "sex acts or sexual contact" where (B) refers specifically to "commercial sex acts."

Notably, as mentioned, subsection (B) specifically applies in cases involving the enticement or transportation of a minor for purposes of prostitution *or for noncommercial sexual activity.* Thus, if a defendant entices or transports a minor for purposes of prostitution and actually engages in a commercial sex act with the minor, that conduct is punished under subsection (B). Subsection (A), on the other hand, accounts for the scenario wherein a defendant entices, transports (or otherwise engages a minor) for purposes of non-commercial sex. This is the correct result. In short, subsection (A) is meant to apply to cases where defendants entice, transport, or otherwise engage minors, and then actually commit a non-commercial sex act with the minor as part of the offense. Subsection (B) is intended to cover situations where defendants entice or transport minors for the purpose of prostitution and then engage in a commercial sex act with the minor.

Here, Carson was found guilty of Count 1 of the indictment, trafficking of a Victim 1, a minor, in violation of 18 USC § 1591(a). Subsection (B) is inapplicable to this case. Subsection (A) would only apply if Carson engaged in a non-commercial

10

sex act in the course of the offense with Victim A. While the evidence in this case shows that Carson did engage in a non-commercial sex act with Victim 1, he disputes that it was part of the offense. As the Court is aware, Carson was found guilty of trafficking Victim 1 and causing her to engage in a commercial sex act. The non-commercial sexual contact between Carson and the 17-year old Victim 1 was separate and apart from the offense conduct. Therefore, the enhancement should not apply.

### 3. Objection to the 2 - point increase to Carson's offense levels for counts 2 -4 <u>because the victims in those counts were found to be vulnerable victims</u>

Carson next objects to the PSR's recommendations, pursuant to Guideline 3A1.1(b), for applying 2-point enhancements to his base offense level for Counts 2, 3 and 4 of the indictment, based on the finding that the physical and mental conditions of the Victims' in those counts, Nahrin Lazzar, Jessica Sikora and Veronica Dal Valle, rendered them "particularly susceptible to Carson's criminal conduct." PSR, paragraphs 50, 58 and 66.

Guideline Section 3A1.1(b), provides that "if the defendant knew or should have known that a victim of the offense was a vulnerable victim," his offense level should be increased by two levels. The application notes to to the vulnerable victim guideline require that the victim must be "unusually vulnerable due to age, physical or mental condition or … otherwise particularly susceptible to the criminal conduct." Section 3A1.1(b), Application Note 2. Specifically, the enhancement

should only be applied when a victim is less able to resist than the typical victim and requires greater societal protection, (*United States vs. Proffit*, 304 F.3d 1001, 1007 (10th Cir. 2002)), and "the evidence must distinguish the victim as atypical of the usual targets of the relevant criminal conduct." *United States vs. Caballero*, 277 F.3d 1235, 1251 (10th Cir. 2002). In assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable. *Id.*

Lazzar, Sikora and Dal Valle can in no way be viewed as "atypical targets" or victims of the criminal conduct in this case – that being the trafficking in prostitution. Each testified that Carson enticed and coerced them into participating in acts of prostitution. However, Lazzar, Sikora, and Dal Valle were each serious, longtime drug users and prostitutes long before they ever met Carson, and in fact, in the case of Sikora, had worked with other pimps before. And the testimony a trial revealed that Carson was aware of this. But that doesn't make these women unusually susceptible victims to Carson's control. It is apparent that they were the typical, though tragic, targeted victims in sex trafficking cases, evidencing no specific traits – such as mental illness, physical vulnerability or low IQ – that would make them especially vulnerable to exploitation. Quite simply, Lazzar, Sikora, and Dal Valle were not unusual victims of the crimes in this case, and finding them to

be especially vulnerable victims is inappropriate. Therefore, there should be no 2-point enhancement pursuant to 3A1.1(b) in this case

### 4. Objection to the 5 - point increase to Carson's offense level because Carson engaged in a pattern of activity involving prohibited sexual conduct

The PSR enhances Carson's combined offense level, pursuant to § 4B1.5(b)(1), by 5 levels because it found that Carson had engaged in a pattern of sexual activity involving prohibited sexual conduct with Victim1, a minor. The PSR based its finding on a summary of the trial testimony of Victim 1 and Chris Richardson, which established that Carson "caused (Victim 1) to engage in numerous commercial sex acts." PSR, paragraph 87. Carson objects to this enhancement.

Guideline § 4B1.5(b)(1) provides, in relevant part, for a five-level enhancement in any case in which the defendant's offense of conviction is a covered sex crime… and the defendant engaged in a pattern of activity involving prohibited sexual conduct." § 4B1.5(b). A defendant engages in a "pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." § 4B1.5, Application Note (B)(i). This guideline is clearly aimed at "repeat and dangerous offenders" and is it intended to target recidivist exploiters of minors," (Committee Background to § 4B1.5) and was adopted to punish "those who have exhibited prior prohibited sexual conduct with two or more victims." Diana Murphy, *Inside the United States*

*Sentencing Commission: Federal Sentencing Policy in 2001 and Beyond*, 87 Iowa L.Rev. 359, 374 (2002) (quoting the Chair of the U.S. Sentencing Commission).

It is true that Carson was convicted in this case of a "covered sexual crime" and that Victim 1 testified at trial that Carson enticed and influenced her to engage in prostitution when she was a minor. But Carson is not the offender that this guideline was clearly aimed at. His actions were not the actions of a "recidivist exploiter" of children who has targeted numerous minor victims in the past. First, Victim 1 was the only minor involved in this case, so there are no prior instances of sexual conduct relating to another minor. And also, while she testified that between November 2009 to March 2010 she engaged in numerous acts of prostitution at the behest of Carson, Carson's conduct during that period was clearly part of the offense conduct of Count One of the Indictment and was taken into account in the PSR's guideline calculations for that count. Clearly, there is no evidence of recidivism in this case the justifies application of § 4B1.5(b). His adjusted offense level therefore should not be increased by five levels pursuant to this guideline.

### 5. Objection to the 2 - point increase to Carson's criminal history points because Carson committed the instant offense while on parole in a state case

Lastly, Carson objects to the PSR adding two criminal history points to his criminal history score based on Carson serving a period of parole during the

pendency of the commission of the offense in this case. In fact Carson's parole for the offense in question was discharged prior to the offense in this case.

U.S.S.G. §4A1.1(d) states that two points should be added to a defendant's criminal history points if "the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status."

On November 3, 2008, Carson pled guilty to felony pandering in DuPage County, Illinois and was sentence to 18 months' imprisonment. Carson was paroled in that case on January 21, 2009, and his case was discharged on October 2, 2009. PSR, paragraph 106.

The commission of the offense in this case started after Carson was discharged from his state pandering conviction. The earliest date charging criminal conduct in this manner is contained in Count 1 of the indictment, which charged that "on or about November 2009 to on or about March 2010" Carson forced Victim 1 to engage in prostitution, in violation of 18 USC § 1591(a) and 2. And Victim 1's testimony at trial indicates and even later date. Victim 1 testified that she first met Carson in January 2010. Carson Trial Transcript, pp.366-68. So Carson's criminal conduct relating to Victim 1 could not have started until sometime in January 2010. Regardless, it is clear that Carson's parole was discharged before his criminal

conduct in this case occurred. The two-point enhancement under §4A1.1(d) is therefore inappropriate.

### C. Carson's Revised Guideline Calculations

If this court grants Carson's objections to the PSR's guideline calculations, the advisory guideline calculations would be revised as follows:

1. Count 1 now has the offense level of 36, and the three additional counts and the one instance of relevant conduct would have an offenses level of 34;

2. For grouping, an offense level of 36 (Count 1), with the addition of four additional units (Counts 2,3,&4 and relevant conduct) results in a combined adjusted offense level of 40;

3. Carson's has three criminal history points and therefore is a criminal history category of II. A criminal history category of II and total offense level of 40 results in an advisory sentencing range of 324 - 405 months.                     .

### II. Consideration of the Factors Listed in 18 U.S.C. §3553 Supports the Imposition of a Sentence Below the Advisory Guideline Range

The District Court is required to give detailed and meaningful consideration to the relevant sentencing factors under 18 U.S.C. § 3553(a). *United States vs. Gama–Gonzalez*, 469 F.3d 1109, 010-11 (7th Cir. 2006); *United States v. Laaufle*, 433 F.3d 981 (7th Cir. 2006). Included in those factors is the history and individual characteristics of the defendant to be sentenced. 18 U.S.C. § 3553(a)(1).

### A.  <u>Legal Standard for Sentencing Pursuant to 18 U.S. §3553(a)</u>

As the Court is well aware, the Sentencing Guidelines are not mandatory, nor are sentences based on the guidelines presumed to be a reasonable, "thus the range of choice dictated by the facts of the case is significantly broadened." *Gall v. United States*, 128 S.Ct. 586, 602 (2007).  In imposing sentence, the Court must "consider all of the 3553(a) factors to determine whether they support the sentence requested by a party, … and must make an individualized assessment based on the facts presented."  *Gall*, at 596-97; *see also United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007) ("Although the guidelines are treated as advisory after *Booker*, the application of section 3553(a) is mandatory").  The Supreme Court requires judges "to impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing" in Section 3553(a).  *Rita v. United States*, 127 S.Ct. 2456, 2463 (2007).   Section 3553(a)(1) also  gives sentencing courts " broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant,'" *Gall*, 128 S.Ct at 596 n.6., and this Court now has broader discretion to sentence in the advisory guideline scheme.  *See, e.g.*, *United States v. Wachowiak*, 496 F.3d 744, 751 (7th Cir. 2007) ("We will not substitute our judgment for that of the sentencing court. . . .  As with other discretionary decisions, the district court is institutionally better situated to make individualized sentencing judgments than an appellate panel."); *United States v.*

*Ngatia*, 477 F.3d 496, 501-02 (7th Cir. 2007). A court may issue a below-Guideline sentence even in the absence of extraordinary circumstances. *Gall*, 128 S.Ct at 595. In fact, the Court's "freedom to impose a reasonable sentence outside the range is unfettered," *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2007), and a sentence that would not have been appropriately reached by a departure before *Booker* may nevertheless be a reasonable sentence after *Booker*. *See United States v.Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005). Additionally, the Seventh Circuit will scrutinize a district court's refusal to grant a reduction below the range. *United States v. Vaughn*, 433 F.3d 917, 924 (7th Cir. 2006).

### B. Carson's Personal & Family History & Circumstances Warrant a Variance from the Advisory Guideline Range under §3553(a)(1)

In order for a sentence to be reasonable, it must be based on factors "unique or personal to a particular defendant," not those that "reflect ... attributes common to all defendants." *United States v. Wallace*, 458 F.3d 606, 612 (7th Cir. 2006) (*citing United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006)). Carson has many "unique or personal" characteristics that differentiate him from other defendants. These very telling characteristics are revealed in the PSR, and in the following sources attached to this memo: the three psychiatric evaluations of Carson performed by Dr. Stephen H. Diwiddie, professor of psychiatry with the Department of Psychiatry and Behavioral Sciences at the Northwestern University School of Medicine (Exhibit 1 - November 8, 2012 Report; Exhibit 2 - April 10, 2015 Report;

18

Exhibit 3 - August 24, 2015 Report); Carson's 2007 - 2008 psychiatric records from Linden Oaks Hospital (Exhibit 4); and the letter addressed to the Court from Carson's Aunt, Emma Chinn (Exhibit 5).

The details of Carson's personal history during his 43 years are both troubling and heartbreaking - the type of heartbreak all too familiar in this courthouse. McKenzie Carson's life has been indelibly marked by mental illness, drug abuse, homelessness and domestic violence, difficult problems to deal with individually, let alone together. He has suffered from these deadly and debilitating challenges continually for almost his entire life, and they have left him psychologically in an almost constant state of depression, confusion and despair, impairing his judgment, leaving him with a feeling of hopelessness, and frequently contemplating suicide. They have caused him to meet life's challenges not with energy and hope, but with a constant sense of anxiety and depression. At times he felt desperately alone, his life careening out of control, but without the skills and resources necessary to come to terms with his problems and fix them. Carson's story is a disturbing one - and tragically, though not surprisingly, it is led here, a convicted felon now facing a long prison term. This Court can and should find that Carson's difficult and heartbreaking personal and family circumstances are mitigating factors that warrant a sentence below the advisory guideline range. *See U.S. v. Schroeder*, 536 F.3d 746, 769 (7th Cir. 2008), *U.S. v. Patzer*, 548 F.Supp. 2d 612 (N.D. Ill. 2008).

Carson's home life was broken from the start. Carson's father, McKenzie Taylor ("Taylor"), was a chronic alcoholic and gambler, a "missing in action" father who provided no moral grounding and guidance to his son. One lasting memory of Carson's time together with his father was sharing of beer with him when Carson was seven or eight years' old. Carson's parents split up (and eventually divorced) when he was in grade school, and Carson saw his father sporadically after that. Taylor, who suffered from dementia and Alzheimer's disease, died in a nursing home in September 2015. Interestingly, in 2011, when Taylor's dementia became so severe he could not take care of himself, it was Carson provided the primary in-home care for his father – care that continued until Carson's incarceration in this case.

After the divorce, Carson's mother, Joyce Davis ("Davis"), remarried, taking Robert Smith ("Smith") as a husband. But with the marriage came the specter of domestic abuse. Smith physically beat Carson and his six siblings as a form of punishment, sometimes with a 2x4. After a while, Davis also became physically abusive to her son. A home life that should have been safe and nurturing was anything but – Carson was in persistent fear of physical abuse. He went to bed at night armed with a can opener, a weapon to defend himself, if need be, from his abusive parents. Of note, Davis died in 2012 after a she was hospitalized for a long period of time with kidney disease. Like his father, Carson cared for his mother

20

before she was hospitalized. She died when he was incarcerated in this case as well.

Carson's education provided frustrations as well. Carson suffered from a learning disability, experiencing serious speech and writing difficulties since kindergarten. Throughout his school career in the Evanston, Illinois and Skokie, Illinois school systems, he was enrolled in special education classes. His teachers were aware of his problems, but there was no formal diagnosis of his disability. Carson was suspended for fighting in his sophomore year of high school and never returned to school.

Thereafter, Carson was on his own fending for himself. Over the years, he worked numerous odd jobs, but was never able to maintain steady employment, often fired from a position due to tardiness, intoxication or drug use. He eventually ended up driving a taxi off and on in Chicago and the suburbs up until his arrest in this case. Carson admits he resorted to selling drugs (Carson had three felony drug convictions in his early 20s) and even selling himself on occasion, to get by.

Carson married Natavia Kennedy ("Kennedy") in 2000, but the union did not last long. Kennedy was a serious drug user and she and Carson battled constantly, sometimes physically, over her drug abuse. Kennedy had a son, Derek, from a prior relationship, who suffered from ADHD and was difficult to control, and raising

21

Derek in a broken, depressing and chaotic household proved difficult and ultimately impossible. Carson and Kennedy separated in 2003. Carson has not seen Kennedy since 2005. Derek is now living on his own.

Carson has been a heavy substance abuser for much of his life. As noted above, his alcoholic father introduced him to liquor during his adolescence and alcohol has been a problem since. Cason smoked marijuana from early in his teens throughout his adult life – smoking weed daily from 2006 until his arrest in 2011. He first tried cocaine when he was in the eighth grade, initially using powder cocaine, then switching to crack cocaine in the 1990s. In the mid 1990s, he began using heroin, snorting or injecting it, sometimes for periods using it daily.

For years, Carson has been in and out of substance abuse programs - Brandon House, Haymarket House, South Suburban, Weiss hospital, Linden Oaks hospital – trying to get a handle on his drug problem. Sometimes it worked and sometimes it didn't. Carson has had periods of sobriety – notably he was clean from 1966 to 2006, and again from 2011 until his arrest in this case – but the pressure he felt living his life often lead to deep depression, anxiety and confusion, and he succumbed to the pressure and began using again. But the daily pressures of everyday life were clearly not the primary reasons for his depression and recurrent drug abuse. It's apparent that Carson suffered from a long-term and debilitating mental illness as well.

### C. Carson's History of Mental Illness and his Diminished Capacity Warrant a Variance under §3553(a)(1)

McKenzie Carson suffers from Bipolar I Disorder, a severe mental illness that was a contributing factor to the offense of conviction, and his diminished mental capacity due to his on-going illness warrants a significant departure from the advisory guideline range in this case. The PSR's advisory guideline range is life in prison. Carson requests a variance from that range, and that the incarceration component of his sentence be 180 months, the mandatory minimum for his conviction.

A severe mental illness is a recognized ground for departing from the advisory guideline range, so long as the mental illness was a contributing factor to the crime charged. *United States vs. Miranda*, 505 F.3d 785 (7th Cir. 2007). "A person who would not have committed a crime but for his mental illness would be less deserving of punishment because he is 'not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired.' " *Miranda*, 505 F.3d at 793, quoting *United States vs. Dyer*, 216 F.3d 568, 571 (7th Cir. 2000).

We now know that Carson suffers from Bipolar I Disorder, which he has suffered from, most likely, since adolescence. We see evidence of Carson's mental in his early years. He was a loner, never fitting in, constantly fighting in school. He reported feelings of deep depression and hopelessness during his preteen years, but

attributed the depression to the physical and mental abuse he was receiving at home. But his depression grew worse. He began having thoughts of suicide. When he was 14 years old, he attempted suicide for the first time by swallowing pills. After this attempt, he was hospitalized for a short period of time at Evanston hospital's psychiatric unit, but was discharged and received no follow-up treatment. In the following years, there were constant thoughts of suicide and multiple suicide attempts, often followed by short periods of hospitalization. But the depression never left him, and his growing use of alcohol, cocaine and heroin – at times on a daily basis - only caused his depression to become more severe and debilitating.

Over the years, when the depression overwhelmed him, Carson sought help for his mental illness at various area hospitals, including Evanston Hospital, Reed Mental Health, Elgin, Good Samaritan, and Linden Oaks. (Exhibit 4, p. 6). For example, In late 2007 and early 2008, Carson was treated at Linden Oaks hospital ("Linden") on two occasions. First, in November 15, 2007, he was admitted to Linden after walking in and complaining he was homeless, deeply depressed, using illegal drugs, and contemplating suicide. He was examined and subsequently treated like Dr. Barry Rabin. Carson was diagnosed with major depression, recurrent, with alcohol dependence and polysubstance abuse. He was prescribed an antipsychotic drug, Risperdal, and Zoloft, an antidepressant. During his inpatient stay, he showed marked improvement, with a lessening of his depression and

anxiety and no thoughts of suicide. He was discharged on December 30, 2007, with directions to continue his medication, stay off illicit drugs, in see Dr. Rabin regularly on an out-patient basis. (Exhibit 4, p.5).

On March 28, 2008, Carson was admitted again to Linden. Carson told Dr. Rabin that he had not been taking his prescribed medication, had been using street drugs daily, had been feeling hopeless, isolated and anxious for months, and was again having thoughts of suicide. He also had not been keeping his outpatient appointments with Dr. Rabin. Carson was diagnosed during his hospital stay as having a bipolar disorder, depressed, combined with polysubstance abuse. Under hospital supervision, he started taking his medication again, and after week of inpatient care, his condition was stabilized, he was less depressed and was not having thoughts of suicide. He was discharged with, again, a strong recommendation of outpatient treatment. (Exhibit 4, p. 10). Carson never followed up on that outpatient care.

Since Carson has been incarcerated in this case, Dr. Stephen H. Diwiddie, professor of psychiatry with the Department of Psychiatry and Behavioral Sciences at the Northwestern University School of Medicine, has performed three psychiatric evaluations of Carson - the first to determine whether he was competent to stand

trial, and other two examinations to determine his present mental condition and risk of recidivism.[2]  Based on these evaluations, Dr. Dinwiddie's opinion is that:

1.   Carson suffers from a bipolar I disorder with psychotic features;

2.   Between Dr. Dinwiddie's first and second examinations of Carson, Carson suffered a serious manic syndrome, with psychotic symptoms, characterized by thought disorder and persecutory delusions, which necessitated a change in his original diagnosis that Carson was suffering from a major depressive order;

3.   Treatment for bipolar I disorder consists of long-term treatment with; a mood stabilizing agent like lithium carbonate - to reduce the risk of recurrent manic or depressive episodes and the long-term risk of completed suicide; and an antipsychotic agent;

4.   Carson suffers from hypothyroidism, and inadequately treated thyroid disease can significantly complicate the treatment of mood disorders;

---

[2] As reported in Exhibit 2, On March 19, 2015, Dr. Willie Mae Jackson, M.D. ("Dr. Jackson"), a forensic psychiatry fellow working with Dr. Dinwiddie, met with Carson at the Kankakee County Jail to perform a psychiatric evaluation to determine risk of recidivism. Dr. Jackson was unable to perform the requested examination at that time because she concluded that Carson was suffering from a bipolar disorder and undergoing a psychotic manic episode, and she had grave concerns for Carson's present mental condition.   Carson was subsequently transferred to the MCC per this Court's order, psychologically stabilized, and Dr. Dinwiddie was then able to complete the requested psychological examination, the results of which are contained in Exhibit 3.

5.   Treatment with antidepressant medication ( which Carson is currently receiving at the MCC) is quite unwise, since it can trigger or worsen manic episodes;

6.  Illicit drug use can aggravate or worsen a bipolar 1 disorder.

Bipolar I disorder is a serious psychiatric condition.  Less than 1% of the population suffer from this disease, and people who suffer from it are 15 times more likely to commit suicide than the general population. Exhibit 6, DSM-5; Bipolar and Related Disorders, pp. 8, 9.  In fact, it is estimated that bipolar disorders account for approximately ¼ all completed suicides in United States. Id.  The disease generally arises in a patient's early teens and twenties, and is characterized by manic episodes followed by major depressive episodes. Id.p. 8. When the bipolar manic episode hits, the patient becomes extremely aggravated, more given to mood swings, more impulsive, and may be violent.  They exhibit poor judgment and lack of insight, their behavior becomes anti-social, often becoming involved in activities that have a high potential for painful consequences, such as engaging in sexual indiscretions or foolish business investments, and their mood disturbances are sufficiently severe to cause a marked impairment in social and occupational functioning. Id. pp. 4-7.   Additionally, during a manic episode, patients often do not perceive that are ill and in need of treatment.  Finally, there is a circularity in the

condition – once a manic state arises, it will arise again rapidly, with manic episodes of occurring more often, always followed by deep depression. Id. p.8.

Mckenzie Carson has not been just sad or depressed over the years, or upset over his current legal situation. He suffers from a serious and debilitating mental illness. His first manic episode probably occurred when he was 13 years old and tried to commit suicide, and his manic episodes - followed by deep depression - have continued their cycle ever since. He was certainly suffering from bipolar I disorder prior to and during the offenses of conviction, and he continues to suffer from the disorder to this day. Dr. Dinwiddie's reports provide strong support for Carson's request for a variance from the advisory guideline range. Carson is clearly not in the "mainstream" of sex trafficking offenders. He suffers from a relatively rare mental illness that leaves him in a constant state of confusion and deep depression, most likely suffering from regularly occurring manic episodes that severely impair his judgment and functioning. Due to his mental illness, it would simply be unfair to punish him with a long prison term for criminal activity that was caused in part by his mental illness. A fair and just sentence in this case would be 15 years' incarceration, coupled with intensive psychotherapeutic treatment to treat Carson's mental disorder, treatment that would be received both in prison and during the period of court supervision to follow.

### D. Carson should be sentenced to a period of incarceration consistent with the sentences received by similarly situated defendants

28

Carson should be sentenced to a term of incarceration consistent with the sentences received by defendants who are similarly situated to him - defendants who, like Carson, were charged and convicted of sex trafficking.

At sentencing, the court needs to insure that there are no unwarranted disparities in the length of sentences of defendants "who have been found guilty of similar conduct." 18 USC Section 3553(a)(6); *U.S. v Statham*, 581 F.3d 548, 66-67 (7th Cir. 2009). In making that determination, the sentencing court may reasonably compare the similarities between conduct and circumstances of one defendant to that of another to ensure that no sentencing disparities occur for similarly situated defendants. *U.S. v. Carter*, 538 F.3d 784, 802 (7th Cir. 2008); *U.S. v. Panice*, 598 F.3d 426, 463-67 (7th Cir. 2010). Section 3553(a)(6) addresses unwarranted disparities "not among codefendants or coconspirators but among judges or districts." *United States v. Scott,* 631 F.3d 401, 405 (7th Cir.2011).

Carson was convicted at trial of sex trafficking of a minor, Victim 1, by force and coercion, in violation of 18 U.S.C. § 1591(a) and 2 (count one), and the sex trafficking of Nahrin Lazzar, Jessica Sikora and Veronica Del Valle by force and coercion, in violation of 18 U.S.C. § 1591(a) and 2. (Counts 2 -4). Briefly, the evidence introduced at trial showed that Carson recruited these four women to be prostitutes for him, gave them a place to stay, took provocative pictures of the women and posted them online as advertisements for prostitution, provided rooms

for them to engage in sex acts for money, transported them to other locations where the women would engage in prostitution, and took for himself a percentage of the money they earned being prostitutes for him. The PSR has considered Carson's charges of conviction, reviewed his criminal conduct in this case, preformed the guideline calculations, and recommended an advisory guideline range of life imprisonment.

The criminal conduct in Carson's case is strikingly similar to the criminal conduct committed by Arnell Misher ("Misher"), a defendant case 14 CR 107, a Northern District of Illinois case before Judge Harry D. Leinenweber. Misher was charged with conspiracy to engage in sex trafficking by force and coercion, in violation of 18 U.S.C. § 1594(c), sex trafficking with minors, in violation of 18 U.S.C. § 1591(a) and (b)(2), and sex trafficking with minors by force and coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1). Exhibit 7, Misher plea agreement, p.1. Misher pled guilty to the conspiracy charge, admitting that he and his codefendant coerced two minors into engaging in prostitution, further admitting that they took provocative photos of one of the minors and then posted those photos, along with the offer of sexual services, as an advertisement online, transported the minors to locations where they would perform commercial sex acts, and then took the money the minors received for sex. Exhibit 7, pp. 2-4. Misher had no cooperation agreement with the government and no agreement for a downward departure.

30

Misher's PSR found Misher responsible for the sex trafficking of three minors, and calculated his adjusted offense level to be 43, which, when combined with his criminal-history category of II, resulted in a advisory guideline range of life imprisonment. Exhibit 8, Misher Sentencing Memorandum. p. 4. Misher objected to PSRs guideline calculations, arguing that his offense level should be lowered to 38 which would result in a advisory guideline range of 262 to 327 months' imprisonment. Exhibit 8, p. 9. On August 12, 2015, Judge Leinenweber sentenced Misher on his conviction of conspiracy to commit sex trafficking of minors by force fraud and coercion, to a term of incarceration of 120 months. Exhibit 9, Misher Judgment of Conviction.

Carson should be treated in a similar fashion. Carson was convicted of four counts of sex trafficking by force and coercion, one count involving a minor. Misher, though he pled guilty to a Section 1594 conspiracy, was held accountable for the sex trafficking by force and coercion of three minors. Both of their PSR's called for a preliminary guideline calculation of life in prison. At sentencing they should be treated similarly, and a similar sentencing scheme should be used to prevent an unwarranted sentencing disparity in this district. Misher pled guilty, received a three-point reduction in his offense level for acceptance of responsibility, and was

ultimately sentence to 10 years in prison.3  Carson did not plead guilty and did not receive a three-point reduction in his offense level for acceptance of responsibility. A fair and just sentence for Carson would be 15 years in prison, the mandatory minimum in this case.

### E. A Sentence Within the Advisory Guideline and the Range is Greater Than Necessary to Advance the Goals of Punishment Articulated in 18 U.S.C. Section 3553(a)

A sentence of 180 months in prison, with a strong recommendation that Carson receive intensive psychotherapeutic treatment both while in prison and when released on supervision, is sufficient but not greater than necessary to provide: (1) just punishment, Section 3553(a)(2)(A); (2) general deterrence, Section 3553(a)(2)(B); and (3) adequate and meaningful rehabilitation, Section 3553(a)(2)(D).  A sentence within the advisory guideline range would be far greater than necessary to meet those needs.

### 1. A sentence within the advisory range would be greater than necessary to promote just punishment under Section 3553 (a)(2)(A)

Giving Carson a lengthy prison sentence within the advisory guideline range is not just punishment.  Carson suffers from a bipolar disorder, a serious mental disease, that may have played a factor in his commission of the offenses in this case.

---

3 Carson was convicted of sex trafficking of a minor by force and coercion in violation of 18 USC Section 1591(a) and (b)1, which carries a mandatory minimum sentence of 15 years in prison.  Misher's offense of conviction, conspiracy to commit sex trafficking, did not have a mandatory minimum.

A person who would not have committed a crime but for his mental illness does not deserve such harsh treatment. *See United States vs. Miranda*, 505 F.3d 785 (7th Cir. 2007). Carson, because he suffers from a serious mental illness, is not within the "heartland" of criminal defendants, and he should not be treated as harshly as those defendants. A sentence of 15 years' incarceration, with contemporaneous and subsequent mental health treatment, is fair and just.

### 2. A sentence within the guideline range is greater than necessary to afford adequate deterrence to criminal conduct under Section 3553(a)(2)(B)

Carson's mental illness impeded his judgment and prevented him from controlling his destructive impulses to commit the sex trafficking offenses in this case. Hence, a long prison sentence - possibly life in prison - would not be a significant deterrent to Carson because he has no control over his disease. " Mental illness might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant general deterrent effect on persons in the defendant's class." *Miranda*, 05 F.3d at 793, citing at *United States vs. Dyer*, 216 F.3d 568, 571 (7th Cir. 2000).

### 3. A sentence within the guideline range would prevent Carson from getting treatment for his illness in the most effective manner pursuant to section 3553(a)(2)(D)

A long advisory guidelines sentence would be a major roadblock to Carson getting the mental health treatment he so desperately needs. We now know that Carson suffers from a serious mental illness – bipolar disorder - and that the

disease has a powerful impact on all aspects of Carson's life. Quite honestly, it remains to be seen whether effective mental health treatment during any period of incarceration, long or short, can be delivered in any penal institution in the United States. An examination of the treatment Carson has received from the United States Bureau of Prisons for his mental illness during his detention in this case serves to prove this point. Carson suffers from bipolar disorder. That was the diagnosis 2008 by Dr. Rabin, the psychiatrist at Linden Oaks hospital, and that is Dr. Dinwiddie's diagnosis in 2015. On both occasions, the recommended course of treatment for Carson was consistent – administration of mood-stabilizing and antipsychotic agents.

But After Caron's arrest and detention in this case, he was psychologically evaluated at the Metropolitan Correctional Center ("MCC") by medical personnel and diagnosed as having depression - the wrong diagnosis – and was prescribed Sertraline, an antidepressant that would only exacerbate his bipolar condition. Exhibit 10 - MCC medical records, p. 1. And, shockingly, when Carson was transferred from the Kankakee jail to the MCC in May 2015 on this Court's order after Dr. Dinwiddie's 2nd report revealed Carson to be suffering from a dangerous manic episode that required immediate treatment, the MCC ignored Dr. Dinwiddie's assessment - which they were given a copy of after Carson's transfer to

the MCC – and continued to treat him as if he was suffering from simple depression. Exhibit 10, p. 2.

There is simply no guarantee Carson will receive proper mental health treatment during his future incarceration for this case. A U.S Justice Department statistics report on mental health problems in prison only deepens the concern, finding that only 24% of mentally ill federal inmates receive any mental health treatment, and only 15% of those receive mental health therapy. Exhibit 11, DOJ Report, pg. 9, chart 14. The offenses that Carson was convicted of were serious ones and were not his first offenses. Carson should receive a prison sentence, but his prison sentence should be minimized to ensure that he receives effective and continuous mental health treatment, which is best affected outside the prison system under this Court's supervision.

## III.  <u>Conclusion</u>

Mckenzie Carson respectfully requests that this Court consider the foregoing discussion of facts and law and sentence him to a period of 180 months' incarceration, with a recommendation that he receive continuous substance abuse and mental health treatment during that period, followed by a continuation of treatment during the subsequent period of court supervision.

Respectfully submitted,


/s/ William D. Shaver
Attorney for McKenzie Carson

William D. Shaver
150 North Michigan Avenue, Suite 2800
Chicago, Illinois 60601
(312) 854- 7054