1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    UNITED STATE OF AMERICA,      )
                                   )    Docket No. 11 CR 00918
4              Plaintiff,          )
                                   )
5         vs.                      )
                                   )    Chicago, Illinois
6    MCKENZIE J. CARSON,           )    October 15, 2015
                                   )    10:40 AM
7              Defendant.          )

8         TRANSCRIPT OF PROCEEDINGS - Sentencing
9         BEFORE THE HONORABLE ELAINE E. BUCKLO

10   APPEARANCES:

11
     For the Plaintiff:      HON. ZACHARY T. FARDON
12                           UNITED STATES ATTORNEY
                             BY:  MS. JENNIFER H. LEVIN
13                           219 South Dearborn Street, Suite 500
                             Chicago, Illinois  60604
14

15   For the Defendant:      LAW OFFICE OF WILLIAM D. SHAVER
                             BY:  MR. WILLIAM D. SHAVER
16                           150 North Michigan Avenue,
                             Suite 2800
17                           Chicago, Illinois  60601

18   ALSO PRESENT:           MR. TROY GROOMS, Probation Officer.

19

20

21

22   Court Reporter:         SANDRA M. TENNIS, CSR, RMR, FCRR
                             Official Court Reporter
23                           219 S. Dearborn Street, Room 2260
                             Chicago, Illinois  60604
24                           (312) 554-8244
                             sandra_tennis@ilnd.uscourts.gov
25

1          THE CLERK:  11 CR 918, Defendant one, USA versus

2    Carson, for sentencing.

3          THE COURT:  Good morning.

4          MR. SHAVER:  Good morning, Judge.  William Shaver

5    on behalf of McKenzie Carson.

6          MS. LEVIN:  Good morning, Judge.  Jennie Levin on

7    behalf of the United States.

8          THE COURT:  Good morning.  Okay.  Mr. Carson can

9    come down.  There are numerous objections that we need to

10   deal with.

11         MR. SHAVER:  I believe Mr. Carson wants to address

12   the Court.

13         THE COURT:  Well, usually that's the last thing

14   before sentencing.  Is there something -- some reason why

15   there should be an exception?

16         MR. SHAVER:  He is claiming he has fired me and --

17         THE COURT:  Well, I already ruled on that.

18         THE DEFENDANT:  I have an attorney that's supposed

19   to be meeting with me here today.  Heather Winslow is

20   supposed to be meeting with me here today to do the

21   sentencing.  It has been nothing but conflict after conflict

22   with -- with him.  And he is trying to sabotage my sentence.

23   I don't agree with his sentence memorandum.  She is claiming

24   in our sentence that -- objection that I'm stalling, your

25   Honor.  I want to get this over with just like -- just like

1    you guys.  I'm the one going through the torture every day in

2    fear for her trying to give me life in prison, you know,

3    and -- and --

4           THE COURT:  Well, technically that's not what she

5    is asking.  Although, I'm not quite sure what the sentence

6    recommendation from the government means, but we'll get to

7    that.  We'll get to that.  Have you hired Ms. Winslow?

8           THE DEFENDANT:  That's what -- we are in the midst.

9    She is going to be here today to meet with my family and me.

10    She spoke with my aunt yesterday and --

11           THE COURT:  Call her up, Jackie.

12           THE DEFENDANT:  And I'm -- you denied paying for a

13    lawyer so my family -- we're going to get the money together

14    to pay for it.

15           THE COURT:  I didn't hear what you just said.  I

16    did not what?

17           THE DEFENDANT:  You denied giving me a lawyer last

18    time I was here.

19           THE COURT:  Wait a minute.  Let's at least make

20    sure that the record is very straight.  In the first place,

21    you were appointed a lawyer.  I don't remember who -- I just

22    noticed that the other day.

23           MR. SHAVER:  Chuck Aron?

24           THE COURT:  No, before him.

25           MR. SHAVER:  Jack Rimland?

1       THE COURT:  Yes.  I don't know -- I can't tell -- I
2   don't have from -- what happened there.  He quit, you fired
3   him, or what happened.
4       THE DEFENDANT:  The first lawyer, I don't believe
5   you were on the stand.  It was a different judge on the
6   stand.
7       THE COURT:  There have been --
8       THE DEFENDANT:  And I was appointed Jack Rimland.
9       THE COURT:  Yes.
10      THE DEFENDANT:  And Jack Rimland, I had him for six
11  months that he never came to see me or accept my calls.  And
12  after six months, he withdrew from the case.
13      THE COURT:  All right.  Well, anyway, is he a
14  Defender?
15      MS. LEVIN:  He is.
16      THE COURT:  He must be.
17      MS. LEVIN:  He was appointed, Judge.  And he
18  withdrew because he was fired by the defendant.  The
19  defendant wanted a new attorney.
20      THE DEFENDANT:  No, he was not fired by the
21  defendant.
22      THE COURT:  All right.  Well, we won't go into
23  whatever the cause of it was, but I saw that.  And then, you
24  know, the Federal Defender was again appointed.  The
25  government -- you know, again, you were having a paid

1  attorney. It was Mr. Aron, who is a very experienced
2  attorney around here. I know you had some disagreements with
3  him. I saw one letter in the -- on the docket. But then, in
4  the end, he asked to have a second attorney. And so it's
5  highly unusual in a case like this, but I appointed an
6  additional attorney. When I say a case like this, it's
7  highly unusual in any Federal case to have two appointed
8  attorneys. But, in this case, I did appoint a second
9  attorney. And so you had two attorneys to represent you at
10  trial. And then, on the eve of trial, he suddenly decided he
11  needed somebody who -- an additional attorney. And while she
12  was supposed to just be helping prepare, technically, at
13  trial, you had three attorneys, two of whom were highly
14  experienced Federal Panel attorneys. Then after -- frankly,
15  you know, they --

16              THE DEFENDANT: Your Honor?

17              THE COURT: They were -- they certainly were
18  zealous. They were extremely zealous. At times I thought
19  perhaps their zealousness exceeded civility. But, at any
20  rate, the jury did convict you and the jury convicted you
21  because the evidence was simply overwhelming, despite the
22  fact that you had two --

23              THE DEFENDANT: Your Honor?

24              THE COURT: -- attorneys who did their best. And
25  you fired them.

1    THE DEFENDANT:  You're absolutely right.  I had

2  Chuck Aron.  Chuck Aron was a great attorney.  I'm not

3  arguing what -- what he is capable of doing.  But what he is

4  capable of doing and what he do is two different things.  And

5  I let you know this way before trial that he refused to file

6  motions, refused to get the evidentiary hearing, refused to

7  explore special investigators to go outside and do research

8  of my -- on my defense.  I wrote a letter to your clerk's

9  office, to you, to Chuck Aron's office, you know.  And I went

10  to trial with a lawyer that said, if it was up to him, I

11  would get the rest of my life in prison.

12    THE COURT:  Wait a minute.  Ellen Domph is

13  considered one of the most highly respected lawyers I know.

14    THE DEFENDANT:  Yeah, I know he is a great lawyer,

15  but --

16    THE COURT:  But she was, too.

17    (Discussion off the record.)

18    THE COURT:  I'm not sure what your aunt said to

19  her.  She didn't know that there was any reason why she

20  needed to be here today.

21    THE DEFENDANT:  I haven't spoken to Heather

22  firsthand.  You know, my aunt spoken with Heather.  And, from

23  my understanding, Heather was going to be in the court

24  building today, you know.  And I was going to be able to

25  speak to her today to employ her for my sentencing, you know.

1  And -- and, right now, I don't have an attorney.  This is not

2  my attorney.

3          THE COURT:  All right.  Well, let's continue.

4          THE DEFENDANT:  And any other thing would be --

5          THE COURT:  I don't want to say that she should

6  come or not come.  She hasn't been hired, apparently.  Okay.

7          Anyway, let me continue this.  I want to finish at

8  least what I have to say on this because I don't -- I don't

9  know if you will think about it; but, anyway, so then you had

10  three attorneys, you fired them all.  Mr. Shaver was

11  appointed.  He has certainly, I think, been diligent in

12  representing you in all of this time.  So the thing is, it

13  has been two years since the trial, or almost two years.

14          THE DEFENDANT:  You say --

15          THE COURT:  It's a very long time.  And this case

16  is -- began in 2011.  We need to have it done.  So --

17          THE DEFENDANT:  I was arrested in 2012.

18          THE COURT:  You came in last time and you

19  disagreed -- well, it has an 11 CR.

20          THE DEFENDANT:  Yeah, I was arrested in 2012, your

21  Honor.

22          MS. LEVIN:  He was arrested, your Honor, I believe

23  it was January 2nd of 2012.  It was indicted in late.

24          THE COURT:  I see.

25          THE DEFENDANT:  I was arrested in 2012.

1       THE COURT:  Okay.  At any rate, the reason I denied

2    it last time is that it sounded like the same thing; that,

3    when an attorney disagrees with you, then you decide that you

4    want them fired.  I have no reason to think some other

5    attorney is going to agree with you.  And, at this point, we

6    are at sentencing.

7       THE DEFENDANT:  It's so much information that's

8    being left out of my sentence memorandum.  It's like, it's

9    surface stuff that is being -- you need to get a real clear

10   picture of me and a real clear understanding of what type of

11   person and individual I am --

12      THE COURT:  I agree with that.

13      THE DEFENDANT:  -- you know, and -- and to just,

14   you know, I'm not saying he didn't discuss me, but it's not

15   detailed.  There is a lot of stuff missing that I think you

16   really should know, you know, um.  This is my life, your

17   Honor.

18      THE COURT:  I understand.

19      THE DEFENDANT:  You know, and, you know, this

20   isn't -- my life is in your hands.  And I believe I -- I

21   deserve a fair shot for you to be able to make the ruling of

22   what type of future I'm going to have, if any, you know.

23   Because it's like -- it's like the world is against me in a

24   sort-of-speak manner.  And I'm not getting a chance at a -- a

25   fair chance to show that I can be a productive member of

1    society, you know.  My life can go to a way better direction

2    if you know the type of individual I truly am, you know.  You

3    have been misled about many things that I can't sit here and

4    go into.  But a memorandum, everything isn't always what it

5    appears to be, you know.  But, you know, it's like, you know,

6    I'm already, before birth, you know, coming in fighting.

7    One-in-a-billion chance to even make -- to survive to the

8    womb to come into this world.  Then you come into this world

9    and it's like everybody is closing in on you.  You know, I

10   mean, you know, I mean, I got certain circumstances that

11   happened in my life that you need to know that led up into

12   the points of things.  Do you understand what I'm trying to

13   say here?  And just surfacing and missing out -- missing out

14   complete stuff.  And, you know, I think Heather can prepare

15   my memorandum much better, you know.  And I --

16            THE COURT:  Well, I'm not going to appoint another

17   attorney for you.

18            THE DEFENDANT:  I'm saying, I'm going to pay for

19   the attorney.  If I have to do the memorandum myself, you

20   deny me -- if I got to do my sentence myself, you deny me

21   assistance of a counsel.  But I cannot go on with someone I

22   feel is trying to sabotage --

23            THE COURT:  I don't think anybody can say that I

24   have denied you the assistance of counsel.

25            THE DEFENDANT:  And he is trying to -- that

1  somebody -- how can I move forward with somebody that I feel
2  that's trying to sabotage my sentencing.  You know, everybody
3  in this world have personal interests in things.  And some
4  things it's very personal to -- to people and -- and certain
5  matters, people can't even make a complete, unbiased decision
6  on things.  You know, we all have special interests that we
7  take up on things, you know.  And, you know, I'm not saying
8  what anybody ain't educated.  I'm not educated.  I got a
9  sixth grade education, special ed education.  But I can't say
10 this man ain't educated for something he went to school for.
11 I'm not arguing that.  But I'm arguing, you know, it's a
12 conflict of interest here.  He even told you several --
13 several times that he came to see me and has been -- we've
14 been fueling at each other.  It's already bad vibes between
15 us.  To have somebody with bad vibes between them and doing
16 my sentence, doing my sentence, he controls what he put in
17 there and what he not.  You know, and -- and last time I was
18 here, I was trying to speak, and you had them remove me from
19 the court.  You said you heard enough.  And somebody gave me
20 this, Faretta vs. California.  Faretta, F-a-r-e-t-t-a, versus
21 California says I have the right to speak and be heard and
22 participate in my defense, you know, to participate in my
23 sentencing and all stages of my -- you know, then I get the
24 objection to the sentence memorandum a day before sentence.
25 I got the -- that objection yesterday.  It was mailed out on

1  the 13th.  He got it on the 13th, from my understanding.  I
2  get the sentence memorandum, what, a week ago, a couple days
3  after the court.  So it was that Thursday.  I got the
4  sentence memorandum, his sentence memorandum, Thursday.  So I
5  had no knowledge that this is just surface -- stuff is
6  missing, a lot of important stuff in this sentence
7  memorandum.  You know, if I had -- if I had knowledge of
8  this, we could have addressed this.  This is something --
9  this is something that should have been brought way ahead of
10  time.  You know, just like everything else, like you said, it
11  has been two years.  Yeah, two years.  A long two years.  I
12  don't want to live in fear every day wondering what my future
13  hold.  I want to get it over with myself.  But, on the same
14  token, at the same token, I want to be able to do everything
15  to bring about, you know, how you say that?  I want to,
16  like -- say, for instance, I didn't -- I didn't hold -- like
17  if I'm holding up the court because I asked for my discovery.
18  No, I -- I -- you know, part of the time was -- we didn't
19  wait too long when I waited a year and a half to get my
20  discovery.  You know, but now -- now, as soon as they ready,
21  Lindberg kept telling them to give me my discovery.  The next
22  thing I know, he is gone.  And, finally, when I get my
23  discovery, it was on a CD that I couldn't even access it.  I
24  kept on bringing it to you-all's attention.  And about time I
25  get the paper print of some of the stuff, I'm being moved

1 four days -- I got the stuff 30 days before trial; and four

2 days before trial, I was moved to the MCC.

3 THE COURT: Well, your attorneys had it. But,

4 meanwhile, I guess I would like both of you to respond to

5 what he has said.

6 MR. SHAVER: Judge, you know that the relationship

7 between Mr. Carson and I has been difficult. I have met with

8 him on numerous occasions, both in Kankakee and at the MCC.

9 Without going into the specifics, because I want to maintain

10 the attorney-client privilege, he has not been forthcoming in

11 assisting me in putting together his sentencing memorandum.

12 He says that it doesn't include -- it's just surface. It

13 just doesn't include the things he wants to say. But,

14 frankly, he has never told me what those things are when I've

15 asked. I've done the best that I can based on what I have

16 had. I think it's a pretty good effort.

17 You know, I'm uncomfortable about representing him.

18 He doesn't want me. He thinks I'm part of some grand

19 conspiracy. I know I'm not -- I'm going to hear all about

20 this later on at some point because he is going to complain

21 about me, as he is going to complain about the other

22 attorneys he has had. But, you know, I've done it to the

23 best of my ability. I filed a motion to withdraw. You

24 denied. I still persevered. I attempted to go over and see

25 him the other day. I wanted to discuss the government's

1　filings with him. We had a major blowup. And I just

2　couldn't continue because nothing was being accomplished.

3　But that's par for the course. I feel very uncomfortable

4　representing Mr. Carson right now. I don't think I should.

5　　　　　THE COURT: Did you -- when did he get the

6　memorandum that you filed?

7　　　　　MR. SHAVER: The memorandum I filed?

8　　　　　THE COURT: Or you were going to file. I assume

9　you gave it to him before you filed it.

10　　　　　MR. SHAVER: I gave him the draft copy the day I

11　filed it. He has had it a long time. I met with him --

12　　　　　THE COURT: Not just since last week?

13　　　　　MR. SHAVER: I've met with him on numerous

14　occasions and asking him if he has read it. The last time,

15　when he actually talked to me, he said he hadn't even read

16　it.

17　　　　　MS. LEVIN: It was filed on September 25th, your

18　Honor.

19　　　　　MR. SHAVER: September 25th. He has had a draft

20　copy since September 25th.

21　　　　　THE DEFENDANT: I was given -- yeah, I was given a

22　draft copy at the end of September. He said he wasn't going

23　to file that one, that he wanted to take some stuff out. And

24　I got the memorandum -- I got the memorandum last week. You

25　gave me the memorandum last week. And it came in the mail.

1    I signed for it.  All right?  So what he is saying, I can

2    easily prove.  I didn't get the memorandum until last week.

3    And I didn't -- I signed for the objection to the memorandum

4    yesterday.  I got the objection to the memorandum yesterday.

5            MR. SHAVER:  I don't care about the attorney-client

6    privilege.  I told him that that was what I was going to

7    file, that it was a draft, but I was going to file it.  So he

8    had what I was going to file on the date that I filed it.  He

9    has had it.  He hasn't even read it.

10           THE DEFENDANT:  I've read the memorandum.  I read

11   the draft to the -- to the memorandum.  You know, he -- he is

12   saying I ain't read it.  You know, I told him I read it.  He

13   wants to say I ain't read it.  If I ain't read it, I wouldn't

14   have knowledge of it.  I wouldn't have knowledge that --

15   that -- that he is asking for 15 years and that he is -- I

16   wouldn't have knowledge that he is using -- that he is

17   missing stuff, you know.

18           THE COURT:  What is he missing?

19           THE DEFENDANT:  He is missing a lot of detailed

20   stuff.  And it's a lot of abuse that I went through as a

21   child that he don't have.  He don't have it all in there.

22   There are some things in there I pointed out that, wait,

23   you-all got this -- this wrong.  And he goes, oh, don't worry

24   about it, it sounds better that way anyway.

25           MR. SHAVER:  That's not true.  That is,

1   categorically, not true.

2          THE COURT: You can say whatever you want to say.

3   I guess the issue is whether -- I don't want this back.

4          THE DEFENDANT: And it was so bad the other day he

5   went to court that -- the other day, he came to the MCC, the

6   officers at MCC had to intervene. He was --

7          MR. SHAVER: I asked them to intervene because of

8   the violence of the confrontation. It was -- I was getting

9   no where and it was getting heated. So I knocked on the door

10   and asked them to come in and get me out.

11          THE DEFENDANT: He is supposed to be a

12   professional. He was yelling at me at the top of his lungs.

13   And at that time I -- you know, I wasn't --

14          THE COURT: He probably was trying to get you to

15   listen.

16          THE DEFENDANT: No, no. They -- they brought me

17   into the meeting area, and I told them I need my legal

18   documents. He got upset because I wanted my legal documents.

19   Why do you always need your legal documents, and this, and

20   that, and got to yelling to the top of his lungs at me. I

21   said: Look, please don't yell at me. I respect you. I

22   don't yell at you. He kept yelling at me. Then I ended up

23   yelling back. It got -- it got really bad. And, you know, I

24   got my own problems, you know, and he is supposed to be

25   professional. You know, and I ended up, you know, and -- and

1    my medication ain't been right for over two -- I wasn't

2    taking my medication.  And they -- they -- I ended up in the

3    segregation.  I've been off medication for, like, two,

4    three weeks.  And they had to give me -- I've been back on my

5    medication for, like, two days now because they said they

6    wasn't going to let me out of the Seg unless I start taking

7    my medication.  So they let me out yesterday and put me on

8    the floor where I could be with the doctor that helps me a

9    lot, you know.

10            THE COURT:  By the way, I didn't notice, and I

11   guess I want the record -- because I saw that in your

12   memorandum, you are referring a lot to mental issues.  I went

13   back to look.  Now, I can't say for sure that something --

14   without getting transcripts of every hearing; but, as far as

15   I know, despite having very experienced attorneys who are

16   strong advocates for any -- whatever they can do within the

17   bounds, there was never an issue raised about mental capacity

18   until after the jury verdict and until after you had come in.

19   I'm not saying that it isn't there.  I realize you decided

20   there was an issue.

21            MR. SHAVER:  Chuck Aaron filed a motion.

22            THE COURT:  But in terms of --

23            MR. SHAVER:  Chuck Aaron filed the first motion

24   because he thought he was incapable of going to trial.

25   That's the first time Dr. Dinwiddie --

1     THE COURT:  I missed that going through it

2 yesterday.

3     MR. SHAVER:  That's the first time Dr. Dinwiddie

4 approached him.  I followed up and hired Dr. Dinwiddie

5 because I thought he had a history with Mr. Carson and it

6 would aid in his evaluation of him and submitting a memo that

7 might be --

8     THE COURT:  All right.  Well, at this rate, there

9 hasn't been any issue other than when he stops taking his

10 medication of his capabilities.  And so it's a question of

11 exactly as you arguing it I think in your memorandum; that

12 whether I should take some history into account in terms of

13 his sentence.

14     MS. LEVIN:  And, Judge, I can speak to the

15 appellate issue, not wanting the case to come back to you in

16 terms of the procedural posture and where we are.

17     THE COURT:  Yeah, I mean, the alternative is that

18 I -- well, there are three alternatives.  I put it off a

19 month and I appoint -- I don't know if they would even let me

20 just appoint somebody that was handpicked.  Usually they

21 don't.  Or I give him a chance to hire her and give her one

22 month and continue this one month and have the sentencing or

23 go ahead today.

24     MS. LEVIN:  Right.  So I think -- and obviously

25 your Honor read our objection to continuing the sentencing.

1    And, in there, we cite numerous cases by the Seventh Circuit
2    which say that, if somebody has had numerous attorneys and,
3    like the defendant, is going to be on their fifth or is on
4    their fourth, it is not an abuse of discretion to deny a
5    continuance for a trial when they come the day of trial and
6    then they have to represent themselves.  So there is -- I
7    think that your Honor has made a strong record in terms of
8    constantly giving the defendant an attorney every time he has
9    had a problem with one; appointing multiple attorneys for his
10   trial.  This Court has bent over backwards to accommodate the
11   defendant with respect to the medical examinations; making
12   sure he is on his medicine, his thyroid medicine.  It has
13   been, if you look back at the docket, one thing after another
14   after another that has delayed this for over -- for almost
15   two years, Judge.  And the truth of the matter is, these
16   additional details he didn't -- the defendant didn't tell
17   these additional details to probation when he was interviewed
18   for the PSR.  The defendant has never mentioned these
19   additional details prior to coming today.  He had every
20   opportunity to do so.  And it's -- it's on the -- when you
21   deny the motion for continuance, now the defendant is coming
22   in when we have our victims here who are, as the Court said
23   last time, entitled to have justice and to move forward with
24   this sentencing and entitled to have closure in this case.
25           It's the same story every time, Judge.  And the

1  defendant will have an opportunity to address the Court.  And

2  the defendant can communicate those details to the Court here

3  today.  And it's the government's position that we should

4  move forward with this.

5         MR. SHAVER:  Judge, my --

6         MS. LEVIN:  He can go -- sorry.  Either the

7  defendant can proceed pro se, or with Mr. Shaver.

8         THE DEFENDANT:  First off, your Honor, I'd like to

9  say she is speculating what I didn't tell the probation

10  officer.  That's pure speculation.  She wasn't there.  That's

11  not personal knowledge.  I told the probation -- there is a

12  lot of things I told the probation officer.  The probation

13  officer did not put it in -- there is a lot of things I told

14  the probation officer.  He did not put it in his report.  And

15  Shaver said that's what the memorandum is for.  We'll, I'll

16  put it in your sentence memorandum.  It's a lot of things to

17  probation.  I even got it highlighted, wrote it on the side.

18  It's even things that the probation wrote down wrong or mixed

19  up, like -- like -- like that my father and mom separated

20  when my father was 60 something years old and my father went

21  to a nursing home.  That's not what I told the probation

22  officer.  It's an art to listening.  And everybody is not

23  good at listening to me because of my speech impediment.

24  Some get annoyed, as you seen through trial how -- how the

25  FBI agent mocked my speech impediment.  And Elaine (sic.)

1    Domph had to ask him, was he mocking me, you know.  Some

2    people get annoyed and intolerant of my speech impediment, my

3    stuttering, and so forth, and stop listening.  When you're

4    not listening, you miss a lot of information.  That probation

5    officer mixed up information, got -- wrote things down wrong

6    and left out a lot of things.

7         I have been, since my arrest, I've been begging for

8    my right medication from McHenry County to Kankakee to MCC,

9    back to Kankakee.  Even at one time Charles Aron said that

10   the government came down to Kankakee and Kankakee told them

11   that my medical condition is fine, that I don't suppose to be

12   on mental health medication.  I was forced to go to trial

13   without even being on -- on -- on my medication.  When

14   Dr. Dinwiddie clearly put in his report that we recommend

15   before trial that he be medicated on his proper medication or

16   he might not be able to participate in his own defense

17   properly.

18             THE COURT:  Stop.  Is any of that true?

19             MS. LEVIN:  No.

20             THE COURT:  Correct it.  I need to know that the

21   record is correct and make sure there is no issue.

22             MS. LEVIN:  Yes.  So, for the record, Judge, AUSA

23   Bhachu stood in for me one day.  And the defendant was making

24   complaints about his medical treatment he was receiving from

25   Kankakee.  He said that he wasn't being given his medicine,

1    he wasn't being visited.  There was a follow-up; and the

2    government obtained the medical records, submitted a letter

3    to this Court, attaching the medical records, showing that he

4    was receiving his medication and that he was being seen,

5    contrary to the defendant's claims.  Dr. Dinwiddie's report

6    was attached to I believe the defendant's sentencing

7    memorandum.

8            THE COURT:  This -- I mean, this happened -- but

9    right now he is saying before trial, that's my concern.  This

10   was after trial.

11           MS. LEVIN:  There was --

12           THE DEFENDANT:  I have the documents to back it up,

13   your Honor.  If you want to pass it for a day, I could bring

14   the documents tomorrow and back up what I'm saying is true,

15   your Honor.

16           MS. LEVIN:  Judge, this did happen before trial.

17   There was an evaluation done of the defendant before trial.

18           THE COURT:  Okay.

19           MS. LEVIN:  In that evaluation, Dr. Dinwiddie found

20   him competent to stand trial.  He found, unequivocally, that

21   he was competent to stand trial.  He had depressive disorder.

22           THE COURT:  Was this after this case was

23   transferred to me?

24           THE DEFENDANT:  Yes.

25           MS. LEVIN:  Give me one moment, Judge.

1           THE DEFENDANT:  Yes.  Yes, your Honor, it was after

2  the case was transferred to you.  I was competent to stand --

3           THE COURT:  All right.  Just a minute.  I mean, I

4  know we had the issue in the last few months.

5           THE DEFENDANT:  I was competent to stand trial.  I

6  had thyroid issues going on that's been going on for years

7  that affects my whole chemical balance and my way of thinking

8  and -- and it controls everything that people don't even

9  realize control that -- I didn't have surgery until the two

10  months before trial and I didn't get on my medication after

11  trial, which, in that evaluation, they stated that both of

12  these needed to be taken care of before trial.

13           MS. LEVIN:  Judge, the prior -- this case was

14  before your Honor.  The evaluation was done per

15  Dr. Dinwiddie's report on September 24, 2012.  That was

16  approximately three months before this case went to trial.

17           THE COURT:  Okay.  You're right.  I granted a

18  motion for a psychiatric evaluation and it came back that he

19  was -- he was competent.

20           MS. LEVIN:  Correct.

21           THE COURT:  And was there any issue raised about --

22           THE DEFENDANT:  It's two parts of the competency.

23           THE COURT:  I at some point had him transferred;

24  right?

25           MS. LEVIN:  Yes, Judge, and that was later on.  So

1  the case proceeded to trial, he was convicted, and he

2  remained at Kankakee County Jail. After -- and I -- I

3  hesitate to say the exact amount of time, but I believe it

4  was about a year after he was convicted the defendant was

5  making additional claims that he was not receiving his

6  medication and was not being seen by the doctors. Mr. Shaver

7  filed a motion to continue the sentencing, an emergency

8  motion saying that he needed to get this medical treatment.

9  The government and defense counsel worked out an agreement

10  and presented it to the Court that --

11            THE COURT:  I remember granting that.

12            THE DEFENDANT:  Your Honor?

13            THE COURT:  And I certainly wouldn't have gone

14  ahead with the trial if there had been any issue whatsoever.

15            MS. LEVIN:  There was no issue, Judge.

16            THE DEFENDANT:  Your Honor, inside that evaluation,

17  if you'll allow me to bring it tomorrow, if you want to pass

18  this until tomorrow, it shows two parts of -- of the

19  competency.  One part that you understand the role of the

20  court and -- and the proceedings.  The other part is your

21  mental health competency.  And they stated in there, due to

22  my hyper -- hyperthyroid and my psychotropic meds, not being

23  on it, that they feel if I'm not medicated and I don't have

24  my thyroid dealt with before trial, I will not be able to

25  stand -- participate in my own defense properly.  To --

1  and -- and some -- in that way.  You know, not quote, but
2  that's what it summed up to.  And I had the documents to
3  prove it.  And this wasn't something that I created to --
4  to -- as a stall tactic, as she keeps on arguing.  This is
5  something that has been a life-long situation for me, a
6  life-long situation, you know, where, you know, times I'm not
7  on my medication, right, dealing with drug issues, and stuff.
8  I mean, I started at Kankakee where I got burn marks all over
9  my back from being taised and tortured by the police where
10  I'm cutting and bleeding myself, right there to die, than go
11  through -- who does that?  Who cuts on themself and just
12  fills up juice cups of blood trying to, okay, how long is it
13  going to take to get to 15 pints so I can die?  Who does
14  that?

15        MS. LEVIN:  Judge, I have a copy of the report, if
16  your Honor --

17        THE DEFENDANT:  I wasn't on my proper medication.
18  And still to this day, I'm not on my proper medication.  I'm
19  on medication, but it's not the medication, even in
20  Dr. Dinwiddie's own report.  And not being proper medication,
21  medicated, it plays a part, too, in -- in relationships with
22  other people as far as me and my -- me and Shaver fueling, me
23  and Chuck Aron, the domestic violence in my life with women
24  that I was in relationships with.  My wife, I got domestic --
25  you look at my criminal history, you see domestic violence,

1  domestic violence.  I grew up to domestic violence.  I grew

2  up in a house full of violence and -- and things I said I

3  don't want to live through when I grew up, I carried on

4  through relationships hurting people that I loved that I did

5  not want to hurt, but I got issues is what -- what I'm saying

6  that needs to be addressed.  And -- and if -- you know, how

7  do you solve something by keep on putting a Band-Aid on it

8  instead of fixing the problem?

9           I don't got no education, but it don't take an

10  educated person to understand that much that, if you can't

11  fix -- if you can't solve it, you can't cover up something,

12  you've got to fix it.  Do you understand what I'm trying to

13  say, your Honor?

14           THE COURT:  I do understand it.

15           MR. SHAVER:  Judge, if I may?

16           THE COURT:  It does seem to me that you are able to

17  tell me in detail and articulately what -- your evaluation of

18  that evaluation, which, frankly, is only telling me that

19  there isn't any reason why we can't go ahead today.  I do

20  want to know, Mr. Grooms?

21           PROBATION OFFICER:  Yes, your Honor.

22           THE COURT:  Is there anything that he told you that

23  you didn't put into this PSR that --

24           PROBATION OFFICER:  I don't believe so, your Honor.

25  I was looking at my Form 1, the interview form we used when

1   we interview every defendant, and it pairs right up with what

2   the language that's in the pre-sentence report.

3       MR. SHAVER:  Judge, I believe, right now, I think

4   my representation is untenable.  He is -- the relationship is

5   totally fractured.  We have no attorney-client relationship.

6   He has called into question the accuracy of what I've done,

7   the competency of what I've performed.

8       THE COURT:  Well, and that will calm down.  I mean,

9   I -- it seems to me that he can supplement it by saying, as

10  he now has, actually, for the last 40 minutes, but,

11  50 minutes, what he wants to add.  I haven't heard anything

12  to think that he -- why I should -- what difference it would

13  make if I continued this, frankly.

14      MR. SHAVER:  He has got a name of an attorney that

15  he thinks is going to represent him in a much better fashion

16  than I do.

17      MS. LEVIN:  The defendant has felt that about every

18  attorney and every subsequent attorney, Judge.  You're

19  absolutely right, nothing is going to change.  This Court, as

20  I had mentioned, has given him opportunity after opportunity.

21  If Mr. Shaver -- if the Court does not want to have

22  Mr. Shaver represent the defendant, then the defendant can

23  represent himself.

24      THE DEFENDANT:  As she said herself, that she has

25  cited cases in the Seventh Circuit why change in defendant --

1   change in attorneys at sentence, at sentence, those case laws

2   refer to at sentence. This issue arised way before sentence,

3   way before. This isn't the first time we spoke on issues

4   between us. This is not the first time. So that doesn't

5   even apply.

6           THE COURT: He wasn't appointed until after trial.

7   I mean, there are two issues. The trial is --

8           THE DEFENDANT: Yeah, but what I'm saying, the case

9   law she wanted to throw in there doesn't even apply to this,

10  you know. Because this came up before the sentence date.

11  This came up before the sentence date. She is talking about

12  people that all of a sudden, on sentence date, you know, all

13  of a sudden, on sentence date, I don't want this attorney.

14  No, this issue has been an ongoing issue, and it has been

15  brought up in this court that -- that -- that it has been an

16  issue.

17          And, like I said, there is a lot of things he

18  didn't put in. The probation officer didn't put a lot of

19  things in. He didn't say -- he is not -- he is not even

20  denying that he didn't. He said he doesn't believe so, your

21  Honor. He doesn't believe so implies doubt, that there is a

22  possibility. And I'm telling you, it's a lot of stuff he

23  left out.

24          THE COURT: Well, I'm going to give you the

25  opportunity to tell me what all he left out, and you can tell

1    me in mitigation.  You clearly are capable --

2               THE DEFENDANT:  Your Honor?

3               THE COURT:  -- of doing this.  I have no reason to

4    think that another attorney -- if another attorney was hired

5    or appointed is going to be able to do any more than has been

6    done.

7               THE DEFENDANT:  Well, surely an attorney is going

8    to be able to do it better than me.  I don't -- I don't know

9    the law.

10              THE COURT:  No, but that's not what you think.  You

11   say -- you have thought that every single attorney was not

12   doing their job.

13              THE DEFENDANT:  I don't -- I don't know the law.

14              THE COURT:  I know you don't.  But you actually do

15   a good job of understanding --

16              THE DEFENDANT:  But I understand that there is

17   steps that are -- are -- I understand, if somebody tell me

18   this paper is yours, but it's always in their possession, do

19   you understand what I'm saying?  So if -- or you can have

20   water at these certain times, but at those certain times, I'm

21   being denied the water.

22              THE COURT:  What have you been denied?

23              THE DEFENDANT:  It's a list of things I've been

24   denied.  That's all in the letter I wrote to the courts

25   before --

1     THE COURT:  I told you the last time --

2     THE DEFENDANT:  Before trial.

3     THE COURT:  -- when I said I was not going to give

4  you another --

5     THE DEFENDANT:  You know --

6     THE COURT:  -- attorney that if you didn't want to

7  cooperate with him, that then you needed to be prepared.

8     THE DEFENDANT:  And -- and then you -- you allowed

9  Chuck Aron to put on two more lawyers, which was just a way

10  he wanted to boost his expenses up.

11     THE COURT:  Wait a minute, are you saying that I

12  should not have allowed the second and third lawyers?

13     THE DEFENDANT:  You shouldn't have allowed Chuck

14  Aron to stay on, as far as I'm concerned.

15     THE COURT:  Well, as I remember -- never mind.  I'm

16  not going to get into that.  Okay.  Let's go ahead.  Please

17  be seated.

18     THE DEFENDANT:  Your Honor, I -- I have a right to

19  finish talking before --

20     THE COURT:  You have a right to talk.  You have

21  been talking out of order for the last 50 minutes.

22     THE DEFENDANT:  Can you please give me two minutes,

23  please?  Can you please give me two minutes?  Please, your

24  Honor?

25     THE COURT:  Yes, two more minutes, and then you

1  will get to talk again before I sentence and to say

2  everything that you want to say.

3          THE DEFENDANT:  You said for mitigation.  I

4  can't -- I can't do this sentence by myself.  I can't -- if I

5  don't have an attorney, you are forcing me -- you are forcing

6  me to do my sentence thing without the due process of

7  attorney.  You asked me what I'm being denied.  That's what

8  I'm being denied, due -- due process says --

9          THE COURT:  No, I'm expecting Mr. Shaver to make

10  whatever arguments that he can make as an officer of the

11  court and as the person who has been representing you for a

12  long time now; and then you can tell me where he is wrong.

13          THE DEFENDANT:  He is telling you this relationship

14  is savage (sic), or whatever the word is.  He is telling you

15  this is -- there is nothing he can do for --

16          THE COURT:  Actually --

17          THE DEFENDANT:  I'm telling you that he is -- I

18  feel he is trying to sabotage.  We're both telling you the

19  same thing, and you are sending me to sentence with him or do

20  it yourself, do it without a lawyer.  That's what you're

21  telling me.

22          THE COURT:  Take a seat.  Let's take two minutes.

23          MR. SHAVER:  Okay.  Thank you, Judge.

24          THE CLERK:  All rise.

25      (Recess taken.)

1    THE CLERK:  Sentencing continues, 11 CR 918, US

2  versus Carson.

3    THE COURT:  All right.  We're going to let the

4  government go ahead.  We're going to deal with these

5  objections, and we'll let the -- those are legal issues.

6  Well, there is factual issues, too, but they're not -- and

7  then I will let the government, as standard here, go ahead

8  and present anything.  I will tell you that we are going to

9  have to stop for approximately an hour anyway, if we're not

10  done -- it sounds like we won't be done -- at 12:15.  I have

11  to go to a meeting.  And we will see where we are and we'll

12  decide later whether we can finish this today or not.

13    So, okay.  Let's deal with -- the government had

14  two objections, I believe?

15    MS. LEVIN:  Yes, Judge.  There were two objections

16  to the criminal history.  There were two additional

17  objections.  However, they don't affect the guidelines.

18    THE COURT:  Right.

19    MS. LEVIN:  They were just for --

20    THE COURT:  On your objections, I think I agree

21  with one and don't agree with the other one.  I mean, I don't

22  know if that makes a difference on the criminal history.  The

23  first one, I don't know that -- I mean, I've read the case

24  she cited that seemed to overrule -- wait a minute, no, no.

25  The first one was actually just a factual thing.

1          MS. LEVIN:  Yes, Judge.  So our first objection was

2  to PSR Paragraph 104.

3          THE COURT:  Right.

4          MS. LEVIN:  It was for a May 14, 2008 conviction

5  for possession of drug paraphernalia.  The actual sentence,

6  as reflected by the attached exhibits, was 62 days as opposed

7  to 31.  So there should be two criminal history points for

8  that conviction.

9          THE COURT:  Does anybody disagree?

10         MR. SHAVER:  I don't disagree, Judge.

11         THE DEFENDANT:  Excuse me, your Honor.  How is this

12  supposed to work?  Because he is not my attorney.

13         THE COURT:  He is your attorney.  At this point,

14  I'm actually asking probation -- I need to ask Mr. Grooms who

15  is behind you.

16         PROBATION OFFICER:  Your Honor, I agree with the

17  government's objection.

18         THE COURT:  Okay.  So --

19         THE DEFENDANT:  I have an objection to government's

20  objection.

21         THE COURT:  Are you disagreeing that you were

22  sentenced to a term of 62 days?

23         THE DEFENDANT:  I was sentenced to -- no, it was

24  62 days and I served 31 days, yes.  I have no objection.  I'm

25  sorry.

1    THE COURT:  Okay.  The next one had to do with
2  solicitation of a sexual act, which I actually think is
3  different than what he has been convicted of.  So I'm
4  actually not going to give him the point for that.  So I
5  don't know if that makes a difference in the criminal history
6  or not.
7    MS. LEVIN:  I believe that, Judge, defense counsel
8  had an objection to the criminal history that will also
9  affect the points.
10    THE COURT:  Okay.  So if it -- on yours, he would
11  get to two points but no more --
12    MS. LEVIN:  Correct.
13    THE COURT:  -- in addition to what -- okay.  Then
14  let's turn to the defendants.  You definitely have some
15  objections.  Let me find it.
16    MR. SHAVER:  First was on the issue of the computer
17  enhancement, under the guidelines, the use of the computer.
18    THE COURT:  Oh, that's what I was starting to refer
19  to.
20    MR. SHAVER:  Yes.
21    THE COURT:  It was actually on your objection.
22  And --
23    MR. SHAVER:  I think you were referring to the
24  *McMillan* case?
25    THE COURT:  Yeah.

1     MR. SHAVER:  You know, I think that *Patterson* is

2   still good law.  *McMillan* suggests that it's just dictum

3   because, in *Patterson*, one, the government agreed that the

4   enhancement didn't apply in that case.  But, two, that the

5   actors were not the same.  They say that the actors were not

6   the individuals who were participating in the offense itself.

7     THE COURT:  Let me make sure we're talking about

8   the same one.  You know, I'm missing something.

9     MR. SHAVER:  *Patterson* is the case that says that

10   you cannot use the enhancement.

11     THE COURT:  I know what *Patterson* does and I

12   know --

13     MR. SHAVER:  *McMillan* is a 2015 case.

14     THE COURT:  Right.  That's the one in which Judge

15   Posner said --

16     MR. SHAVER:  In *Patterson*, they suggested the facts

17   do not establish that there is -- that three-prong persons

18   acting.

19     THE COURT:  I agree.  But in the most recent case,

20   Judge Posner said that, what do you call it, the statement.

21     MS. LEVIN:  The application note for --

22     THE COURT:  That the note simply contradicted by

23   the language of the guideline.  And the language of the

24   guideline clearly would apply here.  Even if I disagreed with

25   Judge Posner, it wouldn't be up to me.  But I actually think

1  he is right.

2          MR. SHAVER:  Well, it is the -- it's the holding in

3  most circuits.  And there is a difference between the

4  guidelines and the advisory note.  Supreme Court says the

5  guideline applies, but --

6          THE COURT:  Right.

7          MR. SHAVER:  I don't think that *Patterson* is just

8  dictum, as Judge Posner said in that -- in that opinion.

9          THE COURT:  But that isn't the issue, whether it is

10  dictum or not.  The question is whether I need to go by the

11  most recent case and what he says, and I think I do.  So --

12  and I think -- we can go back and look at the guideline.  It

13  was --

14          MS. LEVIN:  Judge, it was Guideline Section

15  2G1.3(b)(3).  And, your Honor, there are two subsections.

16          THE COURT:  Right.

17          MS. LEVIN:  This is in reference to Subsection B,

18  as in boy.

19          THE COURT:  2G1.2?

20          MS. LEVIN:  2G1.3.

21          MR. SHAVER:  Judge, the guideline section reads

22  that -- it provides if the offense involved the use of a

23  computer or interactive computer device to entice, encourage

24  or offer or solicit a person to engage in a prohibited sexual

25  conduct with a minor, increase it by two levels.

1    MS. LEVIN:  Judge, I just want to make sure that
2  we're all on the same page.  It's guideline Section
3  2G1.3(b)3(b).

4    THE COURT:  If the offense involved a use of a
5  computer or an interactive computer service to either
6  persuade, induce, entice, coerce or facilitate the travel of
7  the minor to engage in a prohibited sexual -- in prohibited
8  sexual conduct or entice, encourage, offer or solicit a
9  person to engage in prohibited sexual conduct with a minor,
10  increase by two levels.

11    There is -- there is not really any question, I
12  don't think here, that the facts really support both parts.

13    MR. SHAVER:  Yeah, it's --

14    THE COURT:  The only thing was that odd note.

15    MR. SHAVER:  Well, and then --

16    THE COURT:  It doesn't really seem to have anything
17  to do with it.  I actually think --

18    MR. SHAVER:  And then *Patterson* suggested that it
19  applied to both.  The Courts have taken issue with that.
20  *McMillan* suggested that it was wrong.  And I think the only
21  thing I have to hang my hat on is the *Patterson* case.

22    THE COURT:  Okay.  Well, I think that I am
23  obligated to do what Seventh Circuit said, and I do think
24  that's what the guideline says.

25    MR. SHAVER:  Okay.

1          THE COURT:  Okay.  Any other objections?

2          MR. SHAVER:  Next is the objection -- the two-point

3  increase for an offense involve the commission of a sex act

4  or sexual conduct.  I've briefed the issue.  It comes down to

5  whether or not it should -- it's referring to a commercial

6  sex act versus a sexual conduct or sex act.  My position is

7  that Carson did have sex with Victim 1, but it was not part

8  of the offense itself.  The other offenses are not -- are

9  commercial sex acts which are covered in the other section

10  but not in the section that is appropriate in this case.

11          MS. LEVIN:  Judge, under Guideline Section

12  2G1.3(b)(4)(a), if the offense involved the commission of a

13  sex act or sexual contact, then two points are added.  There

14  is no requirement written into the guideline language, no

15  guideline application note that says that the act at issue

16  has to be a commercial sex act.  It's the government's

17  position that it does not have to be a commercial sex act.

18  However, Judge, even accepting defense counsel's argument

19  that a commercial sex act is required here, as the defendant

20  admits, he raped Victim 1.  That is a non-commercial sex act.

21  As your Honor heard through the evidence at trial, it was

22  part and parcel of the instant offense; and, therefore, it's

23  the government's position that two points are applied under

24  this guideline.

25          THE COURT:  How do you respond to the latter part?

1      MR. SHAVER:  The commercial sex act, it's subsumed

2   in the -- on the offense that he has been convicted of, 1591

3   makes it part that used to cause a person to engage in a

4   commercial sex act.  That is the offense in this case, a

5   violation of 1591.  The -- I won't say rape, but, say, having

6   sex with the minor who was in the case but was not a

7   commercial sex act, then, is a separate act in itself and it

8   is not part of the offense of conduct.  The offense of

9   conduct is encouraging her to engage in commercial sex acts.

10      THE COURT:  Well, the rape was part and parcel of

11   it because it was part of the coercion to engage in

12   commercial sex acts.  So just on that ground alone, I think

13   that the two levels apply.  I know you -- you have some

14   arguments about double counting, but those have been rejected

15   at this point by the courts.

16      MR. SHAVER:  They have, Judge.

17      THE DEFENDANT:  I'm sorry, your Honor, could you

18   repeat what you said again, before you said, so you agree?

19   Could you -- I didn't catch what you said.  You said

20   something coercion, but you said something before coercion.

21      THE COURT:  Raping Victim A was, as the testimony

22   at trial showed, part of the coercion to make her engage in

23   prostitution.  Okay.  Go on.

24      MR. SHAVER:  Next objection.  We are objecting to

25   the two-point increase to Carson's offense level in Counts 2

1   and 4 because the victims were, in those counts, were found

2   to be vulnerable victims. We've briefed the issue. The PSR

3   says, because of the physical and mental conditions of the

4   victims, Nahrin Lassar, Jessica Sicora and Veronica Del

5   Valle, that they were particularly susceptible to Carson's

6   criminal conduct. You know, they have to be an atypical

7   victim. And our argument is that they are, regrettably, it's

8   very sad, but they're typical victims of the type of crime

9   that's involved here, which is prostitution. They are not --

10  there is no question about their intelligence. There is no

11  question about their physical meekness. No question about

12  their mental condition. All the condition was suggesting

13  that because they were using drugs, which they had always

14  used in the past, that they were particularly susceptible to

15  his criminal conduct. We don't think, although they are

16  victims in this case, they are atypical victims such that

17  there should be a two-point increase in the offense level.

18          MS. LEVIN: Judge, it's the government's position

19  that these three victims did have vulnerabilities that

20  warrant this enhancement. They were, as the evidence was

21  presented at trial, they were severely addicted to heroin.

22  They had no job. They had no home. They had no families

23  that were looking after them and caring about them. They

24  were in desperate need of money. They were in desperate need

25  of shelter. They were in desperate need of love and

1  affection.  And it wasn't just the fact that they were

2  vulnerable victims, it was these precise vulnerabilities that

3  made the defendant choose these victims and choose to target

4  them.  This is the precise type of victim that the guideline

5  is trying to protect here.  These are not savvy women who

6  were taken advantage of here.  These were women who were

7  crying out for help.  And it was those specific

8  vulnerabilities that caused the defendant to prey on them.

9        THE COURT:  I agree.  All right.  There is an

10  objection to the five-point increase.

11        MR. SHAVER:  Pattern of sexual --

12        THE COURT:  The pattern of sexual conduct.  As I

13  understand it, the pattern of sexual conduct to which

14  probation and the government are saying five points should

15  apply to is because really we had -- well, I mean, at trial

16  we had five, actually, I think, people testify about the same

17  kind of conduct.  It seems to me, if that's the legal

18  definition of a pattern, which I would assume it was, that it

19  clearly applies here.

20        MR. SHAVER:  The definition is two or more

21  instances.  It establishes a pattern.

22        THE COURT:  Are you saying it has to be two --

23  well, it doesn't make any difference whether it's two or more

24  involving the same person or two or more people.

25        MR. SHAVER:  Well, no, it's not two or more people,

1  it's just those are sexual -- separate instances of sexual

2  conduct.  But I think we lose sight of the fact of what this

3  statute was designed to combat.  And it's to combat

4  recidivist offenders.  People who have in the past have done

5  things that hurt people and they are doing it again.  And

6  maybe again.  In this case, it's all the conduct and all of

7  the pattern conduct is encompassed in this case.  This case

8  has been prosecuted.  He has been convicted of those crimes.

9  The guideline levels are affixed by what he was convicted of.

10  And we think this is not applicable to him because there

11  are -- there are no prior cases that they can point to that

12  say that that is a pattern that he has built on in the

13  present conduct.

14          MS. LEVIN:  Judge, may I respond?

15          THE COURT:  Yes, please.

16          MS. LEVIN:  Judge, this guideline punishes activity

17  when there is a pattern of prohibited sexual conduct where a

18  defendant, on at least two separate occasions, engaged in

19  prohibited sexual conduct, here, sex trafficking with a

20  minor.  Now, Victim 1 was a minor in this case.  We know from

21  the testimony from Victim 1 and from Chris Richardson that

22  the defendant repeatedly trafficked her, sent her on more

23  than one prostitution date.  There were more -- there was

24  more than one instance of prohibited conduct here.  That

25  alone is sufficient to satisfy the guideline.

1          To the extent that defense counsel is, and I would

2    just want to address this because it's in his memorandum,

3    attempting to make a double counting argument here, the

4    defendant was convicted of his conduct with Victim 1, now

5    that conduct is being used for the five-point enhancement,

6    that -- that argument is foreclosed by United States versus

7    Von Loh 417 F 3d 710.  The government cited that in its

8    response.

9          THE COURT:  Yes.

10          MS. LEVIN:  So it's our position, Judge, this is

11    very clearcut.  The guideline is applicable based on the

12    evidence that was presented, and we believe that it should be

13    applied.

14          THE COURT:  All right.  I was forgetting that this

15    one was just applicable to the minor, but.

16          MR. SHAVER:  It is.

17          THE COURT:  But there was no question that she was

18    sent on multiple dates for prostitution by your client.

19          MR. SHAVER:  And he was convicted of that and his

20    guideline level was set at that.  Now we're going to increase

21    it some more based on the offense of conduct in this case.

22          THE COURT:  Well, but it's not uncommon that you

23    start with a base guideline, and then it goes up, depending

24    upon what the circumstances are or what the particular

25    activity, sometimes what it involved.  I mean, I don't find

1 │ that -- I don't find that to be contradicted by the

2 │ guidelines or the way that they generally are put together.

3 │ I find that it applies.

4 │ MR. SHAVER: The last Ms. Levin alluded to is our

5 │ miscounting of criminal history points. They assessed two

6 │ criminal history points based on a conviction for pandering

7 │ in 2008. McKenzie was discharged on October 2nd, 2009, in

8 │ that case. The offense of conduct in this case by the dates

9 │ of the indictment is November 2009, the earliest,

10 │ November 2009 to March 2010, which is after the point of

11 │ conviction on that prior case. This case shouldn't apply

12 │ because it wasn't within the --

13 │ THE COURT: Oh, I missed that.

14 │ MS. LEVIN: I can short-circuit this, Judge. The

15 │ government is not going to oppose that objection.

16 │ THE COURT: Okay. All right. So that reduces the

17 │ two points that I had added. So we'll get in the same place;

18 │ right?

19 │ MS. LEVIN: Yes, Judge, we are going to end up

20 │ being exactly the same place. It is going to be -- I will

21 │ tell you in one moment.

22 │ THE COURT: It's a 43, three?

23 │ MS. LEVIN: Yes, Judge.

24 │ THE COURT: Or it's still a three?

25 │ MS. LEVIN: So the revised criminal history points,

1  given your Honor's ruling, are six. And that puts the

2  defendant at a Criminal History Category III, which is what

3  the PSR calculated him at. And the guideline range is 49. I

4  mean, excuse me, the guideline Offense Level is 49, but it's

5  capped at 43. So, therefore, we do have exactly what we have

6  in the PSR, which is a total Offense Level of 43, a Criminal

7  History Category of III, which results in the same guideline

8  range, which is natural life in prison.

9              THE COURT: Did I miss something?

10             PROBATION OFFICER: Well, your Honor, everything is

11 the same except, instead of six points, it's five points, is

12 what my math is coming to.

13             THE COURT: I'm sorry, I'm having trouble hearing

14 you.

15             PROBATION OFFICER: The total criminal history

16 points is five and not six, so the prosecutor just said. But

17 the category is the same. So five points total, not six.

18             MS. LEVIN: Can you just give me one moment to --

19             THE COURT: Yes.

20             MS. LEVIN: That's right, Judge. That's fine.

21 Thank you.

22             THE COURT: Okay. All right. I'll let the

23 government argue.

24             MS. LEVIN: Judge, we have two victims here that

25 would like to address the Court. I know that your Honor

1  wants to take a break in 15 minutes.  Would you like to hear
2  from the victims before we --
3                THE COURT:  Let's try to.
4                MS. LEVIN:  Okay.  So, Judge, if I may ask Jessica
5  to come address the Court first.
6                THE COURT:  Okay.
7                MS. SICORA:  Good afternoon.  I was approximately
8  21 years old when I first met Casino.  I was going through a
9  divorce and was addicted to heroin and crack.  At that time,
10 my addiction was stronger than my will to stop using drugs.
11 I wanted to stop, but my mind would not allow me.  Casino
12 promised to keep me safe.  He promised that he would not rape
13 me or beat me, and he promised that he would provide me food,
14 clothes, drugs and a safe place to stay.  When you are an
15 addict, all you care about is getting high.  To be able to
16 wake up with food, clothes, and the drugs sounded like
17 someone actually cared about me.  So Casino and I made a
18 deal.  I would try it out for three days.  And at the end of
19 three days I would be able to leave if I wanted.
20                The first two-and-a-half days, Casino kept his
21 word.  On the third day, things took a turn for the worse.  I
22 just returned from a four-hour date and was tired and Casino
23 wanted me to go out again.  When I told him I had enough and
24 wanted to go home, he punched me in the face.  He hit me so
25 hard that it permanently scarred my left eye.  My eye

1 immediately began to swell and bruise. I had never been hit

2 before and the pain was unbearable. He took me back to the

3 hotel and calmed me down by giving me more drugs. Still to

4 this day, the scar is visible for anyone to see. I am

5 constantly getting asked what happened to my eye --

6 THE DEFENDANT: Objection, your Honor. They're

7 saying that I permanently bruised her face and speaking on

8 medical stuff that no medical evidence has supported any of

9 these allegations.

10 THE COURT: Well, at this stage, she gets -- a

11 victim gets to make a statement. That's under the law. And

12 you will have the opportunity to contradict it.

13 And if you're saying that it's visible, I suppose I

14 can come down and see it. I can't see that far.

15 MS. LEVIN: And if you recall, Judge, at trial --

16 THE COURT: I do think that was the case, but that

17 was two years ago.

18 MS. LEVIN: It's a permanent blood vessel that's

19 broken in her eye that she can certainly show.

20 THE COURT: Is it visible?

21 MS. SICORA. Yes.

22 THE COURT: Okay.

23 THE DEFENDANT: So is there medical documents to

24 show the date of this injury?

25 THE COURT: This isn't your time to talk right now.

1    MS. SICORA:  I am constantly getting asked what
2  happened in my eye and my mind races back to that day.  But
3  the story I tell is not the truth, and I am constantly
4  ashamed that I have to lie.  Three days turned to three
5  months of continual hell.  The only thing that Casino kept
6  true was his promise to provide drugs.  But Casino's gift of
7  drugs came at a high price.  Casino was able to control my
8  every move by providing or withholding drugs at a moment's
9  notice.  At the time, drugs were the only thing I cared about
10  and Casino knew this about me.  Casino gave me drugs to work
11  and would deny me drugs if he thought I was bad or
12  disrespectful.  Casino would control me by taking me to
13  hotels in areas that I had never been before.  I felt
14  completely isolated.  Casino would take sex from me and rape
15  me violently.  I would cry and plead for him to stop, but he
16  would just beat me for being too loud.  This happened often.
17  The fear of him beating me and raping me kept me paralyzed;
18  and I was unable to leave.  I had no where to go.  And every
19  time I thought of escaping, the fear of Casino killing me
20  would overcome my will to leave.  I often fantasized about
21  escaping, but my fantasy always ended with Casino killing me.
22    I was a victim to much of Casino's abuse, but I
23  also -- but I was also made to witness the abuse that he did
24  to the other girls.  I watched you violently beat and anally
25  rape other women.  I will never be able to get these images

1  or their cries for you to stop out of my head.  Casino, you

2  are a monster and these girls did not deserve to be treated

3  this way.  I am a very forgiving person and never once did

4  you say you were sorry for all the horrible things that you

5  did to me.  At the time, I'm sorry would have gone a long

6  way; but now I know you're only sorry for getting caught.  I

7  don't think you are capable of truly being sorry for the harm

8  that you caused me or the other woman.  I often wonder how

9  you could ignore their screams of pain or their tears and

10  pleads to stop.  The only person you ever cared about was

11  yourself.

12         Now, today is your day to plead for mercy.

13  Although I am still haunted by your violence, I have done

14  many things to improve my life.  I am making an honest and

15  good living, I am going to school, and I no longer do drugs;

16  but socially I still struggle.  I do not trust people.  I am

17  especially untrusting of males; and I fear their potential

18  abuse.

19         I still have flashbacks of some of the unsettling

20  events that took place while I was with you.  Sometimes I

21  wake up in a panic, fearing that I am trapped in a hotel.  I

22  often wonder when these nightmares will end.  I am very happy

23  to close this chapter of my life.  And seeing you get

24  sentenced will be a big part of my recovery.  Thank you.

25         THE COURT:  Thank you.

1    MS. LEVIN:  Now, if we could have Veronica address

2  the Court.

3    THE COURT:  Yes.

4    MS. DEL VALLE:  Well, the day has finally come

5  where justice is being served for me and a whole lot of other

6  victims.  I can bet my bottom dollar you think that you have

7  done nothing wrong.  You have damaged and affected people's

8  lives you don't even know.  Like my husband, for example.

9  Thanks to you and all of the torture you put me through, I

10  have night terrors when I sleep where I scream, I cry, I

11  fight, I whimper, et cetera, et cetera.  I have had such

12  horrible episodes when I sleep, I've woken up to my own

13  husband in tears.  The man was in straight tears because of

14  me crying and fighting and the disturbing things that I cry

15  out because of you.  The man still fights my demons for me

16  still every single night.  He doesn't complain, not one bit,

17  he just loathes you for scarring me the way you did.

18    I ask myself why you felt the need to hurt me so

19  badly.  And that will probably be an answer I'll never know.

20  What you did to me was inhumane and what you did to everybody

21  else was inhumane.  You are a very sick man and you're

22  twisted and you are a monster.  Seriously, you are getting

23  off easily with prison.  You really are.  The only thing and

24  the only hope for you is God, and lots of him.  I will one

25  day forgive you, but I haven't quite gotten there yet.  I'll

1  tell you what, I'll pray for you.  Someone needs to.  Thank

2  you.

3            THE COURT:  Okay.

4            MS. LEVIN:  Judge, may I have one moment?

5            THE COURT:  Yes.

6            MS. LEVIN:  The government doesn't have any other

7  additional victims that are going to address the Court.  My

8  presentation will likely take more than 15 minutes.  Would

9  you like to break and have us come back and begin again when

10  the Court is --

11            THE COURT:  Okay.  If you want to do that, we'll

12  come back at 1:15.

13            THE CLERK:  All rise.

14            MS. LEVIN:  Thank you, Judge.

15            THE CLERK:  This court is in recess.

16        (Recess taken at 12:03 PM.  Resumed at 1:22 PM.)

17            THE CLERK:  11 CR 918, USA versus Carson,

18  sentencing hearing continued.

19            MS. LEVIN:  I apologize I was late, Judge.  Jennie

20  Levin on behalf of the United States.

21            MR. SHAVER:  William Shaver on behalf of McKenzie

22  Carson.

23            THE COURT:  Good afternoon.  All right, everybody,

24  let's go ahead.

25            MS. LEVIN:  Yes, Judge.  As your Honor has already

1  found, the guideline range here is natural life in prison.

2  This type of case is not the type of case that is often or

3  normally seen in federal court.  Similarly, a guideline range

4  of natural life in prison is not the typical guideline range

5  that is seen in Federal court.  One of the difficult things

6  about this case, and just one, is the fact that the numbers

7  are so high.  The government's position after evaluating the

8  factors in 3553(a) and the goals of sentencing is that a

9  sentence of 55 years in prison is sufficient but not greater

10  than necessary.

11      THE COURT:  How does that differ from natural life?

12  He'd have to be 90 something.

13      MS. LEVIN:  That's an excellent question, Judge.

14  55 years in prison is essentially a life sentence for the

15  defendant, who is 42 years old.  And the government strongly

16  believes that the defendant should remain in prison for

17  55 years.  It's specifically asking for a sentence and it is

18  putting a number on a sentence with the knowledge, full well,

19  that asking and receiving that sentence will put the

20  defendant in prison for the rest of his life.  As for the

21  recommendation of 55 years versus life, all I can tell your

22  Honor is that there are a lot of people who weighed in on

23  this decision from my office.  And the office's position is

24  that we are asking for 55 years.  I can certainly tell the

25  Court that the Court is well within its -- its rights to

1    impose whatever sentence it believes is appropriate, if that
2    is natural life.  I know that the victims in this case would
3    like to see the defendant imprisoned for natural life.  And,
4    as probation recommended, excuse me, that is which is also
5    consistent with probation's recommendation, which is a
6    recommendation of --

7              THE COURT:  I'm just wondering how your
8    recommendation was any different.

9              MS. LEVIN:  And practically speaking, Judge, I
10   don't think that it is.  It is just putting a number on it as
11   opposed to asking for a natural life in prison.  But the
12   practical realities and the practical consequences of
13   obtaining a 55-year sentence from this Court is that the
14   defendant would spend the rest of his life in prison.  And I
15   can stand here before you and tell you that for the reasons
16   I'm about to discuss with you, a sentence of 55 years in
17   prison is -- is warranted here based on all of the factors,
18   including the nature and circumstances of the offense and the
19   history and characteristics of the defendant; the incredibly
20   strong need for deterrence, specific and general.  The need
21   to protect the public.  All of these reasons, as I'm going to
22   lay out for you, support giving such a significant sentence.
23   And, again, Judge, the government doesn't recommend 55 years
24   or life, or what have you, lightly.

25             THE COURT:  Don't spend any more time on that, on

1    the difference, because I don't see any difference, so.

2           MS. LEVIN:  Right.  And -- but my point is,

3    whatever you want to call it, we don't ask you for the

4    sentence lightly.  We recognize the magnitude of it.  We just

5    feel that this is a case, if there was a case, that deserves

6    it.

7           So turning to the nature and circumstances of the

8    offense.  Obviously, as your Honor is aware, you sat through

9    the trial so you're very familiar with the facts and

10   circumstances of the case.  Unfortunately the trial was

11   almost two years ago.  So I'm just going to take a few

12   moments and refresh the Court with the evidence that we

13   heard.

14          The defendant, as you know, ran a sex trafficking

15   business for approximately four years, 2008 to the end of

16   2011, and targeted vulnerable women, including the victims

17   that testified at trial:  Kaitlin, Veronica, Jessica, Nahrin.

18   In addition to these four named victims, you also heard from

19   Margaret.  And she talked about being trafficked by the

20   defendant.

21          What you didn't hear about is that, in addition to

22   these five women that you heard from, there were

23   approximately 30 other girls that were trafficked during that

24   four-year time period; 30 other women that the defendant

25   specifically targeted because of their vulnerabilities.  The

1   vulnerabilities that we've talked about at length.  The fact
2   that these girls were addicted to heroin.  The fact that they
3   were out on the street with no support system.  They were
4   homeless.  They were runaways.  And what's so sick about the
5   defendant's behavior is that he would actually go to rehab
6   centers, drug rehab centers, homeless shelters to scout out
7   and find his victims.  He would lurk there waiting for them,
8   preying on them.

9           After the defendant recruited his victims, you
10  heard a lot of evidence about how he treated them.  And quite
11  frankly, Judge, he treated them like cattle, like they were
12  his property.  And he was -- there really are no words.  I
13  thought and thought about what I could say to you to describe
14  adequately and do justice to what he did to these girls.  And
15  every time I thought of something, I thought that's not good
16  enough.  Luckily you were able to hear it from the girls
17  themselves during their trial testimony.

18          But, you know, the defendant had a rigid set of
19  rules that he enforced.  The victims couldn't talk to other
20  men.  They couldn't talk back or otherwise disrespect him; if
21  they did, they would face the consequences.  They couldn't
22  refuse to go on a date.  They couldn't keep the money that
23  they made.  They couldn't hold money on their person.  They
24  couldn't keep their own cell phones.  The cell phones that
25  they did have were for work.  They weren't allowed to use

1    them to make personal phone calls.  They weren't allowed to
2    keep their personal contacts in them.  And the defendant
3    routinely checked the phones to ensure that they were
4    complying.

5                But most importantly, Judge, and what the defendant
6    made perfectly clear to all of these girls is that they were
7    not allowed to leave.  They were never allowed to leave.  And
8    if you broke one of the defendant's rules, then there were
9    consequences.  And the consequences here were extreme.  He
10   enforced his rules with psychological torture and
11   manipulation and physical torture.  He would beat these girls
12   on a daily basis.  He used cords, he used belts, he used his
13   fist.  We saw evidence of this at trial.  Jessica today
14   showed you the broken blood vessel in her eye as a result of
15   the defendant hitting her so hard because she was tired after
16   going on so many prostitution dates and didn't want to go on
17   another one.  And he would rape these girls vaginally,
18   anally.  The night that Jessica was beaten so badly that her
19   blood vessel broke, after that, when they went back to the
20   hotel, the defendant raped her; forced her to perform oral
21   sex on him and then vaginally raped her, as Veronica slept in
22   the next bed.  And as she was crying while she was performing
23   oral sex and she was whimpering because she was being forced
24   to do this, the defendant's response was:  You should be
25   quiet.  I don't want to wake Veronica up.  This is the type

1 of person who is before you. And it's so important for the

2 Court to be able to consider the type of person that is

3 before you when you impose a sentence.

4 The defendant's beatings and rapes were not,

5 though, just to enforce the rules. The defendant took a sick

6 pleasure in hurting these girls. It was a power thing for

7 him. So he did it to make them feel this big. To make them

8 feel worthless. And he did it to make them feel helpless and

9 like they could never leave. And it wasn't just through his

10 physical beatings and the fact that he took sex from them

11 whenever he wanted to. It was also through his verbal abuse.

12 I mean, he told them on a daily basis that they were

13 worthless, that they were nothing, that their lives didn't

14 mean anything. Nobody cared about them. Nobody is coming

15 looking for you. You know, as human beings, we can only

16 endure so much. And to be beaten and raped and also hear

17 that you're nothing repeatedly day after day, you can only

18 take so much of that. And for a young woman, for a girl who

19 is so impressionable and who has no one there looking out for

20 them, they can take probably a lot less before they break.

21 And the defendant broke these girls. And he set out to break

22 them. And he did it with pleasure. And he did it with joy.

23 And he did it without remorse. And I will touch back on this

24 in a minute, but he sits here today without remorse. He

25 tortured these girls.

1   We've talked a lot about and we've heard a lot
2   about the drug use.  I just want to bring your Honor back to
3   a piece of evidence that we introduced at trial.  Your Honor
4   saw that horrific video where Veronica was giving Jessica an
5   injection of heroin and the defendant was filming it.  And
6   you could hear him in the background encouraging it, telling
7   her what to do.  He gave these girls heroin because he wanted
8   them to be compliant.  He wanted them to go on dates.  He
9   wanted them to make money.  And he withheld drugs from them
10  to punish them, knowing that agony, I mean, sheer agony that
11  these girls would have to go through during the withdraw.
12  Jessica stood here today and told you how terrible the
13  withdraw was and that she would do anything for drugs.  It is
14  a powerful, powerful addiction.  The defendant knew that, and
15  he made a choice to exploit it.  And he -- he literally
16  preyed on every vulnerability that these girls had.  You
17  know, sometimes we see things in life and they are so
18  horrible that we have to turn away and we can't even think
19  about it because we ask ourselves, how could someone do this.
20  You know, beating a child, beating an elderly person.  It's
21  just unfathomable.  And I have thought long and hard, how
22  could somebody do this to these girls because, at their core,
23  these girls were just like an elderly person or just like a
24  young person in the fact that they were helpless and
25  vulnerable.  And they needed someone there to help them and

1  pick them up.  And, instead, the defendant saw that and he

2  beat them down.  There is something different about a person

3  who is able to do that.

4  During the testimony at trial, I'm going to go back

5  to Jessica's testimony again.  We also heard about a

6  horrific, horrific rape.  And we introduced a photograph of

7  the defendant raping Jessica.  And you could see her in the

8  photograph.  And she is screaming.  And, if you recall, the

9  testimony was that the defendant raped her while there was a

10  baby in the room, another woman's baby.  And the woman took a

11  photograph of this rape with her cell phone.  And Jessica

12  testified that, as she was being raped and she was crying and

13  in pain and humiliated, the defendant, again, told her to

14  shut up because he didn't want her to wake the baby.

15  I bring up all these examples, Judge, because they

16  are so telling of the defendant's attitude towards women,

17  towards other human beings; and really express and shed light

18  on the type of person that he is, which I am going to come

19  back to and tie into the need to protect society and protect

20  the public from him.

21  Veronica, Kaitlin and Nahrin all testified about

22  the abuse they suffered and the beatings that they suffered

23  and the rapes.  Kaitlin was on the stand, and she told you

24  she was only 17 years old.  And she had moved out of her

25  house for the first time and was in need of money and got

1   introduced to the defendant. And the first time he met her
2   he brought her into a bathroom at a Motel 6 and raped her and
3   then told her he would kill her if she told anybody; and then
4   forced her to work for him. And, Veronica, she told you that
5   there was one time that she tried to get away from the
6   defendant. And the defendant was so determined not to let
7   her go that he used the GPS in her phone to find her because
8   he won't let them go. Another time, Veronica wanted to leave
9   and the defendant put a knife to her throat, threatened her,
10  threatened to kill her grandmother, threatened to kill her
11  child.

12          So there are no limits for the defendant. He will
13  go to any extreme. He will go to the darkest, ugliest place
14  to control these girls. And nothing has stopped him, until
15  he was arrested in this case. Because these girls couldn't
16  get up the courage, understandably, to be able to walk away.
17  And if they did, he came and found them and brought them
18  back; or, in Jessica's case, as she testified, used drugs as
19  a way to get her back. Jessica was in a bad place after her
20  father passed away. Carson picked her up, and he got her
21  heroin. It's constant. And it's a sick need to fulfill this
22  dominance and this power over these helpless girls.

23          One of the other things that I think is so telling
24  is the testimony about the climate of fear that the defendant
25  created. So, for the defendant, it was complete and total

1   control and dominance. That was his goal. That was what he

2   was trying to achieve here. And he did that not only by

3   torturing each individual girl, but he did it by making each

4   individual girl know that he was torturing the others. Look

5   what will happen to you if you get out of line. Look what

6   I'm doing to her. Jessica talked to you today about having

7   to be there while Nahrin was being anally raped. And Jessica

8   is a kind, wonderful girl and has such a big heart. And such

9   a big heart that she felt so guilty about going and talking

10  to Nahrin and bringing her into this -- although it was not

11  Jessica's fault -- that she switched places with Nahrin. And

12  the defendant started anally raping Jessica because Jessica

13  was trying to do the right thing and help because she

14  couldn't bear to watch Nahrin screaming and crying.

15          We also introduced at trial photographs of beaten

16  victims. There was one photograph of a rear end that had

17  been badly beaten. And the defendant showed that photograph

18  to the victims and said: This is what's going to happen to

19  you if you withhold information from me, if you hide money

20  from me. Again, it was a fear tactic, a tactic of

21  intimidation, one that worked for the defendant. While these

22  seem like -- and I don't want to use the word minor; but

23  while these pale in comparison to the types of abuse we're

24  just talking about, I mention them, and I'm going to mention

25  them, because, again, they just show the lengths the

1  defendant will go to to control his victims.

2  The defendant would only let them wear lingerie
3  while they were in the hotel rooms.  And he took their shoes
4  so they couldn't leave.  Again, he took their phones and
5  checked their phones.  Remember Jessica testified that there
6  was one day that she wanted to leave so badly that she was
7  willing to leave naked.  Literally, she started walking
8  towards the door naked.  She would have rather gone outside
9  and faced people with no clothes on, strangers who she had
10  never met, which anybody would think would be just
11  unbearable; and she was willing to do that over stay with the
12  defendant.  But, of course, again, just a game to him, makes
13  her take off her clothes if she wants to leave.  But when she
14  actually starts to walk towards the door, he brings her back
15  inside, and he beats her.

16  You know, looking at the defendant's conduct is
17  only one part of considering the seriousness of the offense
18  here.  I think talking about the harm that he has done to
19  these girls is the other part of it.  And the psychological
20  and the physical harm he has caused them is going to -- and
21  I -- it saddens me to have to stand here and say this to you,
22  but it's going to last a lifetime for them.

23  And today you got to talk -- excuse me, hear from
24  Jessica and Veronica.  And they both told you that they're
25  afraid.  They can't sleep.  They have night terrors.  They

1   want the images out of their head.  They won't go away.  They

2   can't stop seeing what he did to them and what he did to the

3   other girls.  They can't stop hearing the screams.  Jessica

4   testified she can't stop hearing the screams of other girls

5   being raped.  They're not as trusting.  It's affecting their

6   interpersonal relationships, especially with men.  The

7   physical scars, those are easy to see.  But the emotional

8   ones, those are even more damaging than the physical ones

9   because those can change you.  And the defendant did

10  everything he could to change these girls to make them feel

11  absolutely worthless.  You know, they are going to have to

12  spend forever trying to repair and rebuild who they are.  And

13  I know that they are putting a lot of hard work into it.  And

14  I know that they are going to continue to put a lot of hard

15  work into it.  But they're going to have to suffer for the

16  rest of their lives with the consequences of the defendant's

17  actions.  And a sentence that the defendant receives from

18  this Court should similarly force the defendant to spend his

19  life also suffering from the consequences of his actions.

20  And while that will not take away the life sentence that he

21  gave to these girls, what it will do is show them that,

22  contrary to what the defendant told them day after day, their

23  lives do mean something.  They are worth something.  And the

24  defendant is not going to be able to get away with what he

25  did to them; and that he is going to be punished to the full

1  extent of the law.  And he is not going to regain his freedom

2  to be able to do this to anybody else.  It's going to show

3  them that they matter and that justice has been done here.

4  So unless the Court has any questions about the

5  nature and circumstances, I'm going to move onto the history

6  and characteristics.

7  THE COURT:  Go ahead.

8  MS. LEVIN:  There are a couple of characteristics

9  about the defendant that I want to highlight because I think

10  that they are important about evaluating his risk of

11  recidivism and the need to protect the public and the need

12  for deterrence here.  First of all, the defendant, his

13  behavior has demonstrated that he has a real belief that

14  women are to be controlled and that they are worthless.  It's

15  an ingrained belief, and he has acted consistently with that

16  belief, not only in the fact that he literally sold these

17  victims like they were merchandise and made money off of

18  them.  You know, he took sex from them whenever he wanted to,

19  like they didn't have a say, like they weren't even human

20  beings.  When we searched the defendant's computer and we

21  introduced these photos at trial, there were two particularly

22  disturbing photographs.  We attached them to our sentencing

23  memo.  One was of a woman who had a piece of tape over her

24  mouth and it said:  Tape.  Shutting bitches up since 1926.

25  And the second one was of a girl who was badly beaten.  And

1  you could see the bruise on her eye. And it said: This

2  bitch didn't know when to shut up to you. Again, telling of

3  the defendant's attitude. And that attitude makes him a

4  threat to our girls and our young women and our society.

5        The defendant's behavior has also demonstrated a

6  lack of respect for the law. He has repeatedly lied to law

7  enforcement about his sex trafficking activities. And you

8  heard testimony from the victims as well, that he instructed

9  them to lie. If they were arrested or if they were stopped,

10 they were not supposed to say they had a pimp. They were not

11 supposed to tell them what was going on, that they were being

12 abused, they were being beaten. The defendant's criminal

13 history shows that he has 14 previous convictions and 21

14 previous arrests. And as we pointed out in our sentencing

15 memorandum, this Court has seen far worse criminal histories,

16 including much more serious offenses. That being said,

17 Judge, taken as a whole and viewing all of these facts

18 together, his constant refusal to obey the law demonstrates

19 his lack of respect and his attitude towards the fact that

20 there are laws, there are rules that he has to obey and he

21 has to follow. And, further, it's the government's position

22 that the criminal history really doesn't reflect his violent,

23 criminal behavior. Because, again, it doesn't document the

24 fact that he was trafficking all these girls for four years.

25 And it also doesn't document the fact that he is a rapist.

1    The defendant's behavior has also shown that he is
2    smart and he is manipulative. The defendant talks a lot
3    about his sixth grade education. And that may be. But his
4    behavior both out on the street as part of this case and in
5    this courtroom has shown that he is anything but stupid. He
6    has a keen understanding for the legal proceedings that are
7    going on. He understands his rights. He has articulated
8    them to the Court. His words have shown that he is skilled
9    at playing a part. He knows when to act like he doesn't
10   understand what's going on, and then he can turn it off and
11   he can show the Court that he is fully aware of everything
12   and can, you know, cite case law and talk about -- today he
13   knew, oh, I served 31 days, but, yes, I was sentenced to
14   62 days. He knows this stuff inside and out. And he
15   understands it. And he -- in his method of recruitment, we
16   can also see how manipulative and smart and savvy he was
17   because, each girl, he would recruit them differently.

18   So, Kaitlin, she talked about how he promised her,
19   you could be a model and the fame and the money. And that's
20   how he lured her in. And then it turned to violence, of
21   course, and went down the same path. And with Jessica,
22   Veronica and Nahrin, it was controlling them with the drugs
23   and the physical abuse and the beatings. The defendant is a
24   chameleon. And he knows how to get what he wants. And he
25   knows his audience. And he knows how to temper his behavior

1  and his personality to that audience.  And that makes him

2  very dangerous.

3  I think one of the most telling things about the

4  defendant is the fact that he has no remorse for what he has

5  done.  And I touched on this earlier.  The defendant has an

6  excuse for everything.  Nothing is his fault, ever his fault.

7  His post-arrest interview, we attached this to our sentencing

8  memorandum.  There were numerous examples that we cited in

9  the sentencing memorandum from that post-arrest interview

10  where the defendant was confronted with prostituting these

11  girls, taking their money.  His point of view:  I was helping

12  them.  They had trouble holding onto their money, so I was

13  helping them.  I'm just addicted to heroin-using girls.  Poor

14  me.  And, even today, while the defendant was talking to your

15  Honor, he continuously expressed that, you know, he hasn't

16  done anything wrong.  He is the victim.  He said:  I'm the

17  one who is suffering every day.  It's like the world is

18  against me.  I don't want to have to live in fear every day

19  that I might get a life sentence.  It's always about him.

20  And his refusal to accept responsibility for what he has done

21  wrong makes him very dangerous if he gets out because he

22  either doesn't -- he really doesn't see that what he has done

23  is horrific and in violation of the law, and that makes him a

24  danger; or he just refuses to accept it.  And that makes him

25  a danger, a danger of not stopping.

1  Which brings me to the deterrence.  Specific

2  deterrence is really important here, Judge, as is general

3  deterrence.  Specific deterrence and the need to protect the

4  public, we've talked about how the law is not a barrier to

5  this defendant.  He was convicted in 2008 of pandering,

6  continued to engage in sex trafficking.  Again, in 2011,

7  convicted of pandering, continued to engage in sex

8  trafficking.  Numerous, numerous interactions with law

9  enforcement.  None of that stopped him.  Human intervention

10  has not been a barrier.  Kaitlin's mother filed a missing

11  person report, tried to get law enforcement involved.  That

12  didn't stop him from trafficking Kaitlin.  Veronica runs

13  away, tries to hide her phone when she realizes that he is

14  using the GPS to track her; and he still doesn't give up.

15  And what's particularly frightening here, Judge, is

16  that the defendant's role as a sex trafficker does not

17  require heavy lifting.  It requires a skill set.  And he has

18  it, in spades.  It requires being able to be smart and

19  manipulative.  So if he gets out when he is 70, 75, he can go

20  right back into this life.  This is something that he, by his

21  own admission, has admitted he is addicted to.  He is

22  addicted to these girls.  He is addicted to, you know,

23  spending time with them and helping them, in his own words.

24  His age is not going to slow him down.

25  As far as general deterrence, Judge, as I'm sure

1   this Court is aware, there is a culture of sex trafficking
2   out there.  And it is -- you know, this -- these cases don't
3   come around that often.  And when they do, they do receive
4   public attention.  And I'm sure as the Court was aware when
5   this case was going to trial and when there was a verdict on
6   this case, it received public attention.  And this Court's
7   sentence is going to receive public attention.  And a message
8   needs to be sent to people who do this type of activity that
9   it will not be tolerated; that, if you do this in the
10  Northern District of Illinois, you are going to prison for
11  decades.  And a message also needs to be sent because these
12  cases are so hard to prosecute, Judge.  And one of the
13  reasons they're so hard to prosecute is because it is very
14  hard to find victims who have the -- who are willing and have
15  the courage and the strength to be able to come forward and
16  testify against the person who is trafficking them.  Both
17  because the trafficker tells them not to and has so much
18  control over them; and also because I think the victims feel
19  like people don't view them as victims.  You know, looking at
20  them, people think, oh, they used drugs, they were out there
21  prostituting themselves.  But that is not the picture at all.
22  And I think your Honor has been able to see firsthand by
23  presiding over this trial that that is not the picture.  And
24  when they're met with that type of reception or, you know,
25  response, it's very hard to come forward when people don't

1 support you and don't view you as the victim that you are.

2 But a sentence of 55 years in prison here will make a loud

3 statement that these are victims and they can come forward;

4 and they can trust in the legal process; and they can trust

5 in the system; and they will get the justice that they

6 deserve.

7 And finally, Judge, I will touch briefly on

8 sentencing disparity. We talked about this in our sentencing

9 memo. The Court is obviously free to impose whatever

10 sentence it feels is appropriate after it starts by looking

11 at the guideline range, which is life here. The penalties

12 for these cases, 15 year mandatory minimum, life sentence for

13 advisory guidelines, are very severe, but they reflect

14 Congress' intent and the sentencing commission's intent to

15 punish these crimes harshly. And we cited numerous cases in

16 our sentencing memorandum in this district where other

17 defendants similarly situated who have gone to trial and have

18 used violence and rape and drugs and verbal and psychological

19 abuse have received the type of sentence that we are asking

20 for here. It is not out of line with previous cases.

21 So based on all of these factors, Judge, the

22 government respectfully requests that a sentence of 55 years

23 in prison will serve the goals of sentencing, punish the

24 defendant for his behavior and send a message that this crime

25 is taken seriously and it won't be tolerated. Thank you.

1          THE COURT:  Thank you.  Mr. Shaver?

2          MR. SHAVER:  55 years in prison.  55 years.  And

3  the government says they want him to suffer for those

4  55 years.  That's what the government is asking for.  Your

5  Honor says that's a life sentence, and it basically is.  If

6  he serves 85 percent of the sentence, that's eight years off.

7  It will be 47 years.  Four years already served is down to

8  43 years.  That's 86-years-old when he walks out of prison.

9  Is that a just sentence in this case?  Is it sufficient but

10  no greater than necessary to serve the interest of justice?

11  I think that it's much greater than necessary.

12          We've heard from the government about the heinous

13  nature of the crimes committed by Mr. Carson.  The government

14  alluded to 30 women who he has prostituted over the years.

15  We're dealing with five women here, the four women charged

16  and with the one other woman, as relevant conduct.  That is

17  in no way to suggest that crime isn't serious.  They've

18  labeled Mr. Carson a predator, prone to violence, a

19  chameleon, a cold and calculating liar who has

20  psychologically and physical hurt his victims in this case.

21  They say he should never get out of prison, it's a sure thing

22  he will begin sex trafficking again.  We've got to protect

23  the community.  Send a message.  I used to be a prosecutor in

24  this building.  I sent a message all the time.

25          Let's talk about the case and what happened in this

1    case.  One, and I'll explain this later on, that, you know,

2    McKenzie Carson is a troubled soul.  He suffers from mental

3    illness.  And to say that he took pleasure, joy, in

4    administering pain, I think that's beyond the realm.  He

5    committed serious crimes and he should pay for those crimes.

6    But sentencing him to 50 years in prison is just too much.

7    Counsel alluded to sentencing disparities, similarly situated

8    defendants.  And one of the cases they cited themselves,

9    United States vs. Sawyer, which Judge Kocoras handled, he

10   gave Dequan Sawyer a 50-year sentence.  But that was a

11   different case entirely.  That 50-year sentence was for a

12   much longer period.  He was charged with trafficking over ten

13   minor victims.  One of them was only ten years old.  That is

14   a much different case than this case.  Not to denigrate the

15   seriousness of this case, but a much different case.  And

16   Judge Kocoras gave 50 years in that case.

17        We cited the Misher case, which Judge Leinenweber

18   had.  Only two victims, and he pled guilty.  But he was

19   facing life in jail by the guidelines, the advisory

20   guidelines.  And Judge Leinenweber gave him ten years.  There

21   is a disparity that exists, even in this district.  It

22   shouldn't, but it does.

23        So what are we going to do about that?  How long

24   should his sentence actually be?  What is different about

25   this case, different than what was happening in the Sawyer

1   case? Well, we look to the defendant and the personal
2   characteristics of the defendant, which nobody has talked to
3   to this point. The things that differentiate him from the
4   average defendant in this type of case. The things we must
5   consider in sentencing him.

6           What's different about this case? Well, I alluded
7   to it. Mental illness. McKenzie Carson's life has been
8   indelibly marked by mental illness, Bipolar I disorder. He
9   has suffered from this debilitating disease continually for
10  his entire life and it has left him psychologically in an
11  almost constant state of confusion, despair and impaired
12  judgment, leaving him feeling hopeless and frequently
13  contemplating suicide.

14          Before I discuss the mental illness he is suffering
15  from, suffered from then, suffered from now, we should look
16  at his life. He has had a horrible life. His home life,
17  broken from the start. Carson's father was a chronic
18  alcoholic. McKenzie remembered a memory he had with his
19  father was sharing a beer with him when he was only 12 years
20  old. When he left, he was replaced by a stepfather and that
21  stepfather mercilessly beat McKenzie and his siblings with a
22  two-by-four. During the course of those beatings, his mother
23  became involved; and she became physically abusive as well.
24  He didn't have a proper education. He had learning
25  difficulties. He had some learning disabilities since

1     kindergarten.  Serious speech impediments, writing

2     difficulties.  His teachers knew about it, but, you know, he

3     was never formally diagnosed and never received care.  He

4     didn't last long in jail or in prison.  Got in a fight in

5     high school.  And when they kicked him out, he never went

6     back.

7              Over the years, he has worked numerous jobs, but he

8     never could hold a job.  He was constantly depressed,

9     constantly using drugs, liquor.  Would get fired or walk away

10    from the job.  He did everything he could to make ends meet.

11    And McKenzie was a heavy substance abuser, basically from the

12    time he was 12 years old.  First liquor.  Then he used

13    marijuana from the early teen years through his adult life.

14    Then smoking cocaine, snorting cocaine, snorting heroin,

15    sometimes using the substances almost daily.  He sought

16    substance abuse programs, many of them:  Branden House,

17    Haymarket House, South Suburban, Weiss Hospital, Linden Oaks

18    Hospital, trying to get a handle on his problem.  But

19    nothing.  Nothing stuck.  He had a couple brief periods of

20    sobriety, but he was feeling this constant anger, confusion,

21    depression, and he slipped back into the use of drugs again.

22             The personal background of McKenzie Carson was

23    harrowing enough.  We've heard it many times in this

24    courthouse, but it was harrowing enough.  But add to this his

25    bipolar disease.  We now know that McKenzie Carson suffers

1   from Bipolar I disorder, which he has suffered from most

2   likely since his adolescence.  He was always depressed, the

3   records show.  During his pre-teen years, he began having

4   thoughts of suicide.  And at 14, he tried to kill himself,

5   swallowing a bunch of pills.  In the following years, there

6   were constant thoughts of suicide and multiple suicide

7   attempts, often followed by short periods of hospitalization.

8   But the hospitalization wasn't continuous.  He didn't

9   follow-up on his treatment and he would fall into line again

10  of depression, growing disgruntlement, confusion.  And the

11  cycle continued.  Even during this period he was using

12  cocaine, heroin on a daily basis.  And that only exacerbated

13  the way he was feeling.  Over the years, when the depression

14  overwhelmed, he sought help for that.  He sought mental

15  health at Evanston Hospital, at Reed Mental Health, at Elgin,

16  at Good Sam, at Linden Oaks Hospital.  And we have the Linden

17  Oaks hospital records.  In fact, he was first diagnosed as

18  bipolar at Linden Oaks in 2008.  He got -- he got treatment

19  during that period.  The records show he was feeling better.

20  But when he left outpatient, he didn't follow up on that.

21          Dr. Stephen Dinwiddie examined McKenzie.  He said,

22  definitely, he has got Bipolar I disorder.  And he

23  recommended a treatment:  Stabilizing agent, like lithium

24  carbonate, combined with an anti-psychotic agent.  To this

25  day, he is not receiving that medication.  The MCC thinks

1   that he just has depression.  So they gave him

2   antidepressants, which exacerbate his condition.  And

3   Bipolar I disorder is a serious mental condition.  Less than

4   one percent of the population has it.  We hear about it all

5   the time on the news, on television shows.  But only a small

6   percent, one percent of the people, have it.  But of those

7   people, they are 15 more times more likely to commit suicide

8   than the general population.  And estimates by experts

9   suggest that a quarter of all suicides are bipolar related.

10  The disease generally arises in a patient's early teens and

11  20s and is characterized by manic episodes and then followed

12  by major deep depressive periods.  When the bipolar episode

13  hits, the patient becomes extremely aggravated, more given to

14  mood swings, more impulsive, maybe more violent.  They

15  exhibit poor judgment and lack of insight and their behavior

16  becomes antisocial.  Their mood disturbances are sufficiently

17  severe to cause a marked impairment in social and general

18  occupational functioning.  And, finally, from a suffering

19  standpoint, there is a circularity in the condition.  You

20  know, once a manic episode starts, it's going to happen

21  again.  And to end the manic episode, they go into deep

22  depression.  They're in depression, and then the manic

23  episode hits.  And it's a cycle.  And it's over and over

24  again.  A high, aggravated, confused, followed by deep

25  depression and thoughts of suicide.  It must be a horrible

1 situation.

2 McKenzie Carson wasn't just sad or depressed over
3 the years; wasn't just sad or depressed over the fact that he
4 is facing now, in this criminal case, a long period of
5 incarceration. He suffers from a serious and debilitating
6 mental illness. And the manic episodes probably occurred
7 when he was 13 years old, that first one, when he tried to
8 commit suicide, followed by deep depression. And the cycle
9 continued ever since. He was certainly suffering from
10 Bipolar I disorder at the time he committed the offenses in
11 this case. He certainly had periods of high manic state. He
12 certainly had periods of deep, deep depression.

13 The Bipolar I disorder, the severe mental illness,
14 was a contributing fact for the offense of conviction. I'm
15 not saying it caused it. Even Dr. Dinwiddie didn't say it
16 caused it. But did it contribute to what McKenzie -- the
17 facts indicate what McKenzie did in this case? I don't think
18 there is any question of it. And his diminished mental
19 capacity due to that ongoing illness warrants a significant
20 departure under the guidelines. The case law says that a
21 severe mental illness is recognized as a ground for departing
22 from the advisory guideline range, so long as that mental
23 illness is a contributing factor of the offenses charged.

24 McKenzie Carson is not the mainstream of sex
25 trafficking offenders. And, again, I'm not going to suggest

1    and lessen in any way the severity of what he is -- what he

2    has done in this case.  The government says that he is a

3    liar, that he lied.  He lied during his post-arrest

4    statement.  I think if we read that post-arrest statement, he

5    admitted to what was done in this case during that long,

6    rambling interview.  It was used during his trial.  He didn't

7    admit a lot of things.  He didn't admit violence.  But he

8    admitted that he was prostituting those girls and had them

9    out there trafficking for him.  So is he a -- a cold,

10   calculating liar, a manipulator?  You could say that, if you

11   didn't know more; if you didn't know that he was bipolar.  I

12   doubt that he can be so calculating, as the government

13   suggests, knowing that he suffers from this illness.  We've

14   seen him on performance in this case, in this courtroom.

15   That is a smidgen of what it is.  He doesn't seem to control

16   himself.  He goes off on tangents.  I don't think he is the

17   cold, calculating criminal that the government is suggesting.

18   He suffers from a relatively rare mental illness that leaves

19   him in a constant state of confusion and deep depression; and

20   is likely suffering regularly occurring manic episodes that

21   are severely impairing his judgment and functioning to this

22   day.

23           Due to his mental illness, even given the facts of

24   this case, it would simply be unfair to punish him with

25   basically a life prison term for criminal activity that was

1 caused in part by his mental illness. I think a fair and

2 just sentence in this case is a mandatory minimum. A

3 serious, serious sentence, 15 years in jail. McKenzie Carson

4 is 43 years old. He'll just be under 60 when he gets out.

5 For recidivism sake, even Dr. Dinwiddie's report says, as he

6 gets older, he is less apt to recidivate. He will be old

7 when he gets out of prison in 15 years.

8 I'd ask the judge to sentence him to 15 years. I

9 would also ask you to suggest to the Bureau of Prisons that

10 he is in need of psychological help. That the Bureau of

11 Prisons is not right now providing him with the psychological

12 help he needs. Certainly the medication is wrong, and he is

13 acting out because of that. I'd like to see McKenzie Carson

14 on an even keel. I would like to see the McKenzie Carson who

15 is receiving the proper medication to see what he can do. He

16 suggested to you, Judge, that he can be a valued member of

17 the community. Maybe that's the case. It hasn't been the

18 case in the past. But then we now know he suffered from this

19 mental disease. Please sentence McKenzie Carson to 15 years

20 in prison.

21 THE COURT: Thank you. Mr. Carson, it's your

22 opportunity to speak.

23 MR. SHAVER: Judge, his aunt would like to say a

24 few words.

25 THE COURT: All right.

1     MR. SHAVER:  One moment, Judge.  Judge, I would ask
2  Emma Chin to come up now.  She is McKenzie Carson's aunt and
3  she would like to say a few words.  I have attached her
4  letter on behalf of McKenzie to the sentencing memorandum in
5  this case.

6     MS. CHIN:  Thank you, your Honor, for giving me a
7  minute of your time.  My name is Emma Chin.  I'm McKenzie
8  Carson's deceased mother's sister.  And you heard a lot of
9  negative things about him, but I want to tell you, I'm not
10  here to say if he is right or wrong.  I just want to let you
11  know the McKenzie Carson that I know.  And I'm trying to undo
12  some unjust that was done to my nephew the whole time he was
13  growing up.  I tried to intervene when my sister, his father,
14  his stepfather, but nobody would hear me.  The courts, the
15  school, when I went to them and pleaded for him, nobody would
16  hear me.  And I witnessed him being abused, suffered.  I
17  couldn't even begin to tell you the suffering he went through
18  with his family.  And in school he was picked on.  He was
19  beat up every day.  He was in special ed.

20     And the McKenzie Carson that I know, I'm not saying
21  what's in the street, that I know, I have a mentally retarded
22  brother.  He took care of my brother.  He bathed him.  He did
23  everything he could do to help the family.  He even took care
24  of his abusive father when he couldn't move anymore.  He even
25  took care of my sister who wasn't there to defend him as a

1  little boy as he was being beaten.  And I had my own family.

2  And maybe I could have did more.  I tried to do as much as I

3  can as an aunt, but they wouldn't let me.  I was bound by the

4  court because now they take child abuse a little serious than

5  back in the day, in the '80s, when he was growing up.  And

6  they take bullying at school a little serious now than they

7  did when McKenzie was growing up.

8        But McKenzie is a good person.  He has always been

9  there for the family.  And, you know, he got addicted to

10  drugs and the streets caught him up.  And, you know, but

11  there is nothing I can say but good things about my nephew.

12  And I ask your Honor, can you please take that under

13  consideration when you sentence him because he has been

14  through a lot.  And I'm trying to undo what happened to him

15  as a child.  So if you would take that under consideration, I

16  would really appreciate it.

17        THE COURT:  Thank you very much.

18        MS. CHIN:  Thank you.

19        THE COURT:  All right.  Mr. Carson?

20        THE DEFENDANT:  Your Honor, there is a lot of

21  things I want to say.  And I want to say first, I bounce

22  sometimes.  It's something I can't control.  If you notice

23  throughout, I bounce on one thing, then to here.  I don't

24  know how to put things, stay in order.  If you can please try

25  to bear with me as I try to say some things.

1             First, I want to address the last things that was

2    addressed and try to stick there first to some things I'd

3    like to say, like Ms. Levin and here today and throughout the

4    trial, the word that's been pounding in my head that she

5    said.  If you can allow the pictures in, it goes towards

6    my -- she basically said some word that was saying it goes

7    towards the way I feel or think towards women.  That --

8    that -- what's the -- um, I can't think of his name right

9    now, Carrie's partner.  Can you help me, please?

10             MR. SHAVER:  Was it the FBI agent?

11             THE DEFENDANT:  Yeah, him.  Let's see.  The FBI

12    agent testified that those were pictures that were downloaded

13    to my phone.  And you allowed it in as it goes towards my

14    thought of mind.  That's what you said.  And the pictures

15    were the pictures she spoke of today that -- with a woman

16    duct taped and a woman with black eye and a black -- bruises

17    over her body, or whatever.  And those pictures if -- if --

18    if I had knowledge of those pictures before trial, that they

19    were even part of discovery, or anything, I would have been

20    able to explain what I would like to do today about those

21    pictures.  Those aren't pictures that I downloaded all -- he

22    was able to testify they were downloaded to my phone.  Yes,

23    they were downloaded to my phone, not the computer, as it was

24    changed -- as the story was changed today.  But they were

25    downloaded because the first thing you do when you get a

1  smartphone, you've got to decide do you want sites to visit
2  to your phone or -- or to your phone card or to the little
3  small memory that comes with the phone.  And the normal
4  average person choose the bigger memory place, which is your
5  memory card holder, whatever.  So you got people -- you go
6  through Facebook pages and people put all types of -- some
7  people put stupid images, stuff that doesn't express any of
8  your opinions or views, or so forth.  These images, if a
9  computer expert was on the stand, that the person that
10 actually went through the phone would have been able to
11 testify, those was cookie images.  Those are what those
12 images is.  It's not -- it's not my state of mind towards
13 women.

14             You know, yes, I've made mistakes and I've never
15 denied making mistakes.  And I am truly, despite on what
16 Ms. Levin might feel, I'm truly sorry for all mistakes I've
17 made in life, even mistakes that ties into this case, you
18 know, and -- and not saying that because I'm here and I'm
19 arrested, and so forth.  My actions show when I learned to --
20 when I came to the knowledge of Kaitlin's true age and when I
21 found out her true age, it messed me up so bad that it scared
22 me clean.  And I have not put a drug in my body since June
23 16th -- June 14th, excuse me, 2010.  That's -- you know,
24 maybe it took several months for me to get clean, but it --
25 do you understand what I'm saying?  You do something that,

1  you know, but what I'm saying is, you know, that right there

2  shows, you know, a person trying to turn their life around.

3  I wasn't arrested, you know, turning my life around. You

4  know, when I got arrested, I was taking care of my elderly

5  father that couldn't feed himself, couldn't cook for himself

6  and dealing with trying to deal with my mental illness at the

7  same time on the phone with the crisis line crying and

8  dealing with my stuff. And they -- I couldn't -- it's hard

9  for me to -- it was hard for me to take care of my dad. So

10  they had to give me the -- they gave me a number where people

11  came in and started giving me a break because, you know, I

12  already got my own problems. And they had to see if -- give

13  me a relief a couple hours a week because I had a breakdown

14  over the 1-800 crisis line phone number, whatever, but. And

15  I'm running to the hospital to see my mom that was fighting

16  for her life at the time, you know.

17          It's a lot that -- I never say I'm stupid. Yeah,

18  I'm smart. I got a learning disability. I'm not good with

19  remembering words, and stuff, but, for some reason, I've been

20  good with numbers all my life. And that's how I was able to

21  be a cab driver because I'm good with numbers. I'm not good

22  with -- you know, it's documented throughout school history

23  of my disability. You know, I -- I can read a book and

24  couldn't even explain the book to you. But, yeah, four years

25  locked up, yeah, I'm starting to -- three -- three of those

1    four years I was quiet in the courtroom.  I had nothing to

2    say because I didn't even understand what was going on, you

3    know, except for asking for the discovery, you know.  I mean,

4    today, or last week, probably, the most conversation, but.

5         I don't know, what I'm trying to say is, no, nobody

6    in this world deserve a lot of things that they've been

7    through.  Veronica, Jessica, Nahrin, Kaitlin and many other

8    people in this world.  Nobody deserves it.  Nobody deserves

9    to feel less than.  And I never intended to do anything to

10   make them feel less than, you know, or, you know,

11   sometimes -- sometimes in life you look back and your actions

12   didn't level out with your intent.  You know, like, when --

13   when I was a kid growing up watching my dad beat my mom all

14   the time when she was in so much fear that she went to my

15   aunt's house and got my uncle's gun and would hide it behind

16   the chest for maybe if she get fed up with it one day.  Or

17   watching my other uncle beat his wife, you know.  And I grew

18   up saying, I never want to be that person.  I was a mama's

19   boy.  I loved my mom.  I loved -- you know?  I cried when she

20   cried.  You know, I hurted when she hurted, and that's it.  I

21   made a promise to myself I would never put my hands on a

22   woman.  And I remember the first time I did something against

23   my word, my belief, and everything, how it affected me and it

24   affected my life many times.  And, at one point, I went to

25   South Suburban domestic violence class voluntarily.  It

1  wasn't nothing to do with no court system.  Parenting class.

2  It was parenting and domestic tied in together.  I just

3  had -- told my sponsor it ain't helping me -- you know, it

4  had a bonus thing, too, even help me to try to parent better

5  because I was a single father raising my son by myself after

6  me and my wife separated due to her drug addiction.  I was

7  trying to continue to raise a son that I didn't -- I wasn't

8  even the biological father.  But Derek is always going to be

9  my son, you know.  And I was trying to raise him.  And Derek

10  is ADHD and I got my problems, too.

11  And, you know, what I'm trying to say is, you know,

12  no matter what the government may say or anyone else, you

13  know, the calling me a monster and predator, I know what type

14  of person I am.  I'm a good individual that made some bad

15  mistakes in my life.  And some of the mistakes I made were

16  very bad.  But I know that I'm a good individual and they

17  can't define who I am, you know.  And no matter what happens

18  today, I can continue to strive to show people that I am a

19  good individual.  That I made bad mistakes, but to let my

20  further actions show that I'm a good individual.

21  I got clean -- my first time getting clean was in

22  '95.  '95 to 2006.  When you look at my criminal history,

23  from '95 to 2006, you don't see no arrests.  I was clean.  I

24  was on my medication.  I was going to my group meetings, the

25  Bradberry (phonetic) service.  And I was going to my drug

1 meetings. And then my wife started using drugs. And I had a
2 mental breakdown and isolated in the house for two years.
3 And then when I came out of that isolation, I relapsed
4 because the thing that was helping me and keeping me on
5 track, I isolated myself away from it. My medication was
6 keeping me on track. The meetings, the groups, all that
7 helped. All that together change the type of person I was,
8 changed the type of person that I was. That our spare
9 bedroom was open to the newcomer that didn't have a place to
10 lay for the night that people would -- at the groups are,
11 like, are you crazy, you don't know what he might have in his
12 pocket. I said: That's what Dr. Bob did. They opened a
13 door to a stranger, you know. And I had no problem opening
14 the door to strangers for a couple nights, let them get a
15 couple days clean and try to find them a -- the house, the
16 halfway house, and go to because people helped me like that.
17 When I got out of treatment, I went to halfway house and
18 to -- they at the halfway house taught me how to live better.

19 I know that I could be a productive member of
20 society through the right resources. I know it because I
21 have achieved it. I'm not pointing a finger saying this
22 person, that person, just because I say that I had some
23 things happen that I'm not -- no, I'm not pointing the blame
24 finger. I'm not here to point the blame finger. Yeah, I'm
25 saying, I'm just here saying, under certain circumstances, I

1  know I can do better.

2      I had a mental health probation officer.  If he
3  could have wrote a letter like he wanted to, but he said he
4  is not allowed to without a court order.  And it would have,
5  you know, because he -- he worked for Cook County.  But he
6  was my probation officer.  He know what type -- nobody knows
7  me as far as public people like him, you know.  Or the
8  shelter.  I used to go volunteer at First Baptist Church
9  shelter on holidays and feed -- and feed the homeless on
10  holidays at Thanksgiving.  When I got clean, that's how I
11  spent my holidays.  You know, a lot of times I wouldn't spend
12  it with my family.  I told them, I said, I got to serve them
13  because, when I was out there homeless, somebody served me.
14  And the program teaches you to give back that was so freely
15  given to you, you know.

16      So I know what to do under -- I learn what to do
17  under the right circumstances, and stuff.  And if I didn't
18  have my mental breakdown, you know, I -- I had to put my wife
19  out.  They took my son because my wife was on drugs.  And
20  they told me if I wanted my son to come back to the house, I
21  had to put a restraining order on her.  You know how hard it
22  is for a non-biological father to get a restraining order on
23  a biological mother?  That right there speaks for itself what
24  type of person I am and can be.  If the courts granted a
25  non-biological father a restraining order on a biological

1   mother and allowed a non-biological father to -- to provide
2   and take care of a child that he did not give birth to or,
3   you know, I'm not -- or you know what I mean, a father
4   biologically.  But I always said Derek was always my son
5   before I even met him.  I felt like God made me to be his
6   father, you know?  He was -- he was my everything, you know?
7   He was my little man.  I would go work on the car.  He is
8   right there with me changing the oil, you know.  You know,
9   um, I watched him from his different stages.  Like he was
10  only in second grade when I met him.  And, you know, that was
11  the curious grades stage where he asks you a million
12  questions, you know.  And the different stages, you know, and
13  what separated us is the time it took for me to get Derek
14  back at home.  They put Derek in a group home until I get the
15  restraining order.  And -- and DCFS had to -- they had to do
16  it by the papers, or DCFS had to take custody of Derek and
17  then give me guardianship.  So that took time.  So I had to
18  go to Irving Park every weekend to pick him up for the
19  weekend visits.  And I was without him throughout the week.
20  But then he was in an environment where it changed, you know,
21  his behavior.  You know, you put a child that has ADHD around
22  kids that come from all different background and -- and he
23  was in homes where these kids talked to the adults all
24  different type of ways and try to fight him.  So after the
25  time it took, he come back home, try to fight me.  And I

1    tried and tried.  I couldn't -- I didn't know what to do.  So
2    I made what I feel was the worse mistake of my life.  I told
3    DCFS I couldn't take care of him.  And that, too.  It
4    spiraled from, first, I had to get the restraining order on
5    my wife.  Now I lost my son.  Then my mom came and said I got
6    to come get the dog and take the dog to the shelter because I
7    didn't have the energy to get up out of bed and walk the dog.
8    I didn't have the energy to eat.  I was too depressed.  So my
9    mom had to remove my dog and give it to Naperville shelter.
10   And all these things I'm losing just kept on contributing
11   more to my depression, you know.  And all this on top of no
12   meetings, no -- no, no group meetings, only meetings in -- no
13   counseling meetings.  I stopped taking my medication, stopped
14   showering.  You know, waking up every day staring at an
15   orange electricity cord, just listening to Alicia Keys torn
16   between the two because I was torn whether to live or die.  I
17   wanted to take that cord and wrap it around my neck and wrap
18   it around a balcony at the same time and jump.  And maybe
19   that would have been better.  Maybe, you know, we wouldn't be
20   here if that would have happened then, you know.

21            I don't try to hurt people.  I don't want to hurt
22   nobody.  I love people.  I love the people I love best.  I'm
23   a counselor.  And a counselor, we like to help people, not
24   hurt people.  I didn't intentionally of my own -- you know,
25   the government may disagree.  I'm not here to argue any

1   agreement, but I'm just saying Veronica, you know, she was
2   somebody I was in love with, you know.  That was my
3   girlfriend.  We were a couple.  We'd go spend time with her
4   kids, go to the ice cream thing, take them out for ice cream.
5   You know, I would tell her, come on, get some games for them.
6   We'd get some games for them ordered, you know.  If
7   Veronica's mom was here to testify, she would say that, you
8   know, I encouraged Veronica to spend time with her kids.
9   Before Veronica met me, she hadn't spent time with her kids
10  in three months, you know, or longer.  You know, she started
11  spending time with her kids on a regular because I encouraged
12  that, you know.  Because I grew up looking out the window
13  waiting for my dad to come with broken promise, over broken
14  promises, you know.  But, no, he ain't coming, he coming.
15  And the hours would turn to days or week because he was
16  someplace stuck in a bar somewhere or a gambling house
17  somewhere.  You know, and it's a lot of abuse that I grew up
18  to that I didn't even get into, but.  And I'm not going to
19  get into because it has been touched on.  But, I mean, I've
20  been through abuse, been beat with two-by-fours, living in
21  the country, and the green part of the corn stalk.  Wet it
22  and whip it and see what that do, you know?  And I tried
23  killing myself swallowing a bottle of pills.  They put me in
24  a guardianship of the state.  And what the state do?  They
25  put me right back in the house of abuse.  But on paperwork

1    we're going to say you living with your older brother.  All

2    that DCFS case worker cared about probably the money he was

3    getting because he so didn't care about my well-being.

4           So after being in a mental hospital for some time

5    where I stayed at Evanston Hospital until the insurance ran

6    up where I was transferred to a state hospital, Reed Henry

7    Warner for kids mental hospital where I was abused, where I

8    was restrained.  I was raped by own male staff, shot up with

9    Thorazine and restrained.  The story is because you got

10   caught smoking a cigarette because the people that came on

11   visits would sneak us cigarettes, give us cigarettes.  But

12   John liked to have his way with you when you was drugged and

13   cloudy off these psych meds that you didn't even need, like

14   Thorazine and Haldol.  So when I get out -- how do I get out,

15   first of all?  A kid that lived in so much fear that pulled

16   the fire alarm and climbed over a wire fence and ran down

17   Irving Park Road with his bloody hands and feet to get away.

18   And I make it from Chicago back to Evanston Hospital.  And

19   the person that I trusted, Nurse Kathy, I trusted her so

20   much, I told her.  She calls security behind my back and they

21   take me right back to Henry Horner.  Then three days, maybe a

22   week later, Henry Horner released me.  Now all of a sudden

23   nothing wrong with me when I'm trying to put the truth out

24   what's going on in there to me.

25          But my time at being at Henry Horner, after

1  fighting the hallucid drugs that they give you, that John
2  would give you so he could have his way, you start enjoying
3  the effect of it.  I grew up vowing that I would never, ever,
4  use drugs.  But 13, 14, after getting used to fighting the
5  drugs that they shot me with and ended up drinking where I
6  developed an ulcer, I went to St. Francis Hospital.  About
7  16, I had a peptid ulcer, a baby ulcer.  A 16-year old that
8  drunk so much that they had a baby ulcer.  My uncle said,
9  don't worry, you don't need to drink, just smoke weed.  I
10  started smoking weed with him and his wife that led to other
11  drugs.  And I enjoyed the effect of those drugs.  That led --
12  weed is nothing but the gateway to all drugs and all.  So
13  when I finally led to heroin, I found a similar effect of the
14  same effect that I felt from the hallucid -- the Haldol and
15  the Thorazine type of drugs that I got drugs.  Haldol, you
16  were only supposed to get if you were harmful to yourself or
17  other.  I got it for smoking a cigarette.  That was the
18  paperwork statement.  But the truth of the matter, John
19  wanted his way again.  It was always about John.

20         It's a lot, you know, that I wish I can -- if I can
21  go back and change the hands of times, you know, I think that
22  it's a song that says that.  And I relate sometimes my
23  feelings with music.  And it goes with -- I just wish I could
24  change it.  I wish I could change everything.  But the only
25  way you can change things is by doing better in the future.

1 And I know I could do better. I know I can.

2 I'm asking you to have mercy on me, as God has
3 mercy on all of us. I'm begging for my life. I'm begging
4 for my life. I ain't never -- I -- I never -- this is -- I
5 never been faced with -- -- I never been faced with such a
6 serious crime in my life, you know. Most of my crimes, if
7 you look at my history, were self-inflicted crimes, as we
8 call it in the program. Self-inflicted because I'm chasing
9 after one more, one more high so I don't got to feel or think
10 of the pain and the things that went through me as a child,
11 you know. So let me get one more bag, one more bottle, one
12 more line, one more whatever because, for some reason, I
13 thought the drugs would fix me. They didn't fix me, they
14 just hallucinated me. I was accustomed to it from those
15 drugs that I first learned took away everything. You know,
16 the Thorazine. So chasing after that escape, the great
17 escape that never happens. Because when the high gone,
18 you're right back, messed up in the head, wishing it would go
19 away; but it never goes away. So why would I intentionally
20 inflict the same pain on anyone that I deal with every day of
21 my life.

22 You know, I talked about probation officer, you
23 know, left out some things and -- and that's some of the
24 things even I don't remember seeing in the probation thing,
25 even him speaking about the times that I prostituted myself

1    for one more escape, you know.  You know, sometimes that, you

2    know, even my ex-girlfriend, you know, prostituted ourself

3    with this teacher that wanted me to dress up like a woman,

4    you know, and dress him up and put lipstick on us and all

5    that crazy stuff that makes me feel like I'm going to throw

6    up.  But if it was the key to making the pain escape out of

7    my mind, I did it, you know.  I did a lot of things that I

8    didn't want to do, voluntary and involuntary.  And the

9    Narcotics Anonymous books say, drugs change you into a person

10   you don't want to be.  And I surely was the little boy

11   playing with fire hydrants, saying I want to grow up to be a

12   drug addict.  I wasn't thinking I wanted to grow up to be a

13   drug addict, I wanted to grow up to be mostly unbalanced.

14   Most of my life I've been homeless, homeless because I

15   preferred to be homeless.  Started out being placed back into

16   the indirect custody of my mom, you know.  So that's when the

17   running away started, you know.  And -- and then I left home

18   at an early age and I came back at a wrong age, you know,

19   after a few setbacks and relapsing.  Because, throughout my

20   addiction, you know, it was a lot of bridges burnt with

21   conflicts between me and my mom, you know.  And my mom passed

22   away since I been here.  I don't know how much you're aware.

23   That fact is I love my mom.  She had a very, very bad

24   marriage that put her through a lot of things.  And she

25   always tried to do the best that she can do, but she was a

1   mother at a young age that -- very, very young age that made
2   bad decisions, you know.  And we all make -- we all capable
3   of making bad decisions at times.  The question is, do we
4   learn from them.  And, you know, our relationship wasn't
5   mended because, throughout my addiction, you know every time
6   I got high, you know, the hurt and anger, every bag or bottle
7   I put in to me, the anger just -- just increased because it
8   fueled, it fueled the fire, so to speak, of things I went
9   through growing up.  But it took a while for me.  So,
10  throughout my addiction, I said some things to my mom that
11  I -- I didn't mean at times, you know.  My mom gave me the
12  gift of life.  Through God, my mom gave me the gift of life.
13  I can never take that away from her.  She was a great mother.
14  She worked three jobs, you know, trying to take care of four
15  kids.  Despite whatever mistakes she made, she was a great
16  mother because she was the greatest mother she knew how to
17  be.  And she tried to do the best she could do for all her
18  kids.  But I had completely stopped talking to my mom one
19  time in life.  And at one point I lived with my aunt right
20  there, 811 Callan.  That was years ago.  And I can always
21  remember addresses, numbers, for some reason.  802 Dobson,
22  311 Custard, 302 Callan.  It just -- numbers stick with me.
23  But a lot of stuff, I can go on all day with numbers.  I can
24  go on with numbers to customers that -- that I get an order
25  to go take to the airport here or there forever, you know.

1    But I'm not good with -- but before I get too bouncy, what

2    I'm trying to say -- let me try to re-focus.

3          What I'm trying to say is those bridges were mended

4    through medication, program, sponsor.  You know, all the

5    group therapy meetings.  But then, you know, sponsor had to

6    teach me that I had to let go.  Let go and let God, you know.

7    That was in the past because I -- I couldn't blame my mom.  I

8    can't go through the rest of my life blaming my mom, my dad

9    or anyone else for things they done at me.  I got to look at

10   the part I played in it, you know.  And, you know, I got

11   to -- I learned to pray for people that I were mad at because

12   that's where you find forgiveness and peace and through

13   prayer.  Prayer and understanding.

14         You know, before I got arrested, I was searching.

15   I was searching, I was lost and searching for a better

16   relationship with God.  I just felt so lost and confused.

17   You know, and it's funny how things turn out sometimes

18   because I used to pray, God, if I get arrested, God, let me

19   find you.  Let me find you.  Although, God been right there

20   all the time.  God is everywhere.  We just don't grasp what

21   he is giving us at times.  But it took me to be incarcerated

22   and out of my mind, like the whole world is going down.  And

23   I feel like I'm gasping for breath, can't breathe.  I'm

24   breathing, but the air is not coming.  Where is it?  I get a

25   phone call.  They tell me to come to the attendant office and

1    it's my aunt on the phone saying my mom is gone, you know.

2    And this was very, very -- a month after I was arrested, you

3    know, I took my mom to the hospital, May 6th.  I never forget

4    the date, May 6, 2011.  Two days before Mother's Day.  Took

5    her for some simple pain.  And nobody couldn't tell me in a

6    million years my mom would never walk out of that hospital

7    alive.  And I wasn't able to be there, comfort her or tell

8    her I love her one last time.  And when you wake up and

9    realize you don't -- you can't even pick up the phone,

10   everyday life.  My mom died at a very young age, 60 years

11   old.  I could never hear her voice anymore.  I could never

12   say, mom, I love you.  I miss you.  I'm sorry.  I can't hear

13   her say:  McKenzie, it's going to be okay.  You got your

14   whole life ahead of you.  You'll be okay.

15          My dad, I grew up watching my dad beat my brother

16   with a horse whip.  One day I told my brother about it, and

17   he was shocked.  He was shocked because he thought I was too

18   young to even remember.  I cried with my brother.  My brother

19   had whips on his body the size of one of those big patch of

20   band aids.  One day, when I got clean, I called my brother, I

21   said:  I'm sorry how dad treated you different.  To this day,

22   my brother still called my dad, dad; and that wasn't his

23   biological father.  His father died when he was a baby.  And

24   it's things like that that motivated me to give Derek all the

25   love I can and treat Derek the best I could treat him as a

1    father, a kid and a human being.

2    My dad was abusive.  He was -- belittle me.  The
3    favorite word he had for me is:  Boy, you ass backwards.  You
4    can't do nothing right.  I remember going -- it was our
5    weekend to spend with my dad, and he finally came.  We going
6    to the theater.  And somebody bumped him.  And then somebody
7    else got to shaking his pants, they dropped their contacts,
8    the whole time they picking his pocket.  And I'm trying to
9    tell him:  Daddy, daddy.  Leave me alone.  I'm trying to help
10   them get the -- get their contact.  Dad?  Leave me.  So I
11   left him alone.  They picking his pockets.  When he got done
12   looking for something that wasn't there, I said:  Daddy, they
13   just took your wallet.  Boy, you ass backwards.  I tried to,
14   you know.  I wasn't McKenzie or Kenzie to my dad.  95 percent
15   of the time I was, "Boy."  I can't ever remember my dad
16   telling me he loved me.  Never, ever.  That's why I always,
17   even when I get done, you know, telling Derek you can come
18   out of the corner, I give him a hug and embrace him.  I love
19   you, son.

20   But at times my dad did show me he loved me.  He
21   got me on one arm and my sister on another, he would be
22   swinging us at the park.  It meaned so much if I could ever
23   hear the word, and I never in my life could remember ever
24   hear the word.  But I learned to accept that maybe he grew up
25   in a different time.  Maybe, you know, you weren't supposed

1  to tell a man or a boy you loved him, maybe, you know.  Just

2  like you weren't supposed to cry.  If my dad see me cry, he

3  will push me around and smack me and tell me to stop crying.

4  A man ain't supposed to cry.  If somebody chased me home

5  because I was in special ed and beat my ass and I come

6  running home, excuse me, he told me to get out there and

7  fight or he going to beat me.  Not the best of alternative.

8  Lose-lose situation.

9          In school, I feared on a daily basis where I

10  started stealing out of people's lockers from the older guys,

11  stealing out of their lockers.  So I used the money I'm

12  stealing to buy everybody ice cream so I wouldn't be getting

13  beat up.  The principal called and said, your son is stealing

14  money to buy stuff for everybody.  He didn't understand why.

15  And I never told him.  It's because I was tired of getting

16  beat around for being special ed.

17          I had teachers that didn't even have basis to try

18  to teach us.  It wasn't just me, we were in special ed.  But

19  all they cared about is whether -- whether they going to --

20  they got to get us graduated.  So it's some test to graduate

21  by 8th grade.  I failed it two times.  They just gave me the

22  answers.  And you call that teaching?  I was told that by a

23  teacher that I can never get better in reading, that my

24  reading would never change.  Today, I know that to be a lie,

25  just like the Devil is.  In four years, I learned how to read

1  words.  I ain't never learned how to read.  I never had an

2  interest in opening a book to try to read because the teacher

3  told me life early on that I would never be able to read

4  right.  I might read slower than other people.  It might take

5  me a week to read a 400 page book, but I can read it.  I've

6  been learning words I didn't -- never knew I could learn.

7  Friends sent me a Webster and Thesaurus.  But I used to keep

8  going on and just skip a word when I didn't try to pronounce

9  it.  Then I'm learning how the P-h really say F.  I didn't

10  know that.  I'm 42 years old.  It took me 43 years to really

11  know how to use a pencil.  I cried when I learned how to use

12  a pencil.  I got a callus right here because I held a pencil

13  right here because I couldn't get how to hold it.  The

14  teacher said, just lay it right here.  Big old callus I had

15  because I spent my life not holding the pencil right here

16  because the teacher didn't have the patience to teach me.

17  They had those cursive cards to learn how to -- teachers lost

18  interest in teaching me that.  They even lost interest in

19  even trying to help me with reading where they will just put

20  me in a booth and get me a head phone with tapes that read to

21  me.

22      I never forget, I think it was around 2000, when No

23  Child Left Behind came out.  And I cried.  I was so happy to

24  hear that because my son was 7th grade.  And I said, with

25  that, Derek can get a proper education because it always

1  played on my self-esteem, and stuff, of what I can say or
2  what I understand, you know, that some people could talk at a
3  higher level, you know.  I was told that if a person is
4  teachable, they are reachable.  That's a slogan, one of many,
5  we got in the program.  And I tried to keep an open mind
6  where I can be teachable and I -- and in four years I've been
7  learning how to read.

8       I know -- I know I can move forward.  And, you
9  know, if given the opportunity, have a career and contribute
10  to not just the community, but my country.  I -- '95, I was
11  charged with possession of drugs, delivery of controlled
12  substance and possession of drugs, I believe it is.  Another
13  self-inflicted crime to support my habit.  I was -- the crime
14  was -- the crime was -- the drugs were self-inflicting, you
15  know, to inflict more pain on myself, that's -- by using
16  drugs, I was in possession or seller of the drugs, or both, I
17  don't remember exactly.  But, with that probation, I got TASC
18  probation.  And that's when TASC probation first started.  It
19  was a strict two-and-a-half year TASC probation.  Not once
20  did I drop dirty with going to my meetings, seeing my
21  probation officer, you know.

22       I know I'm changeable because God is the one that
23  changes people.  As long as you have God in your life and --
24  and you following steps, you know, and with the support.  You
25  know, my aunt and my cousin, they're not the only support I

1    got.  I got loving family that live in the south.  They're

2    not able to be here.  I got -- I got family in Arkansas and

3    in Georgia, Little Rock, Arkansas; Pratville, Alabama,

4    Conyers, Georgia.  I got a sister in Naperville that is going

5    through some things herself right now; and she is unable to

6    be here, you know.  But they love me.  My family love me, and

7    I love them.  And I got support.  And as long as you got

8    support, you can -- as long as you got your support, like we

9    call it in the program, networking support group, support

10   team, you know.  But the truth of the matter, the long --

11   longer someone was locked up, the less support they're going

12   to have.  Just in four years I lost three people:  My father,

13   my mother and a cousin.  Two of them at a very young age.

14   The cousin, to Stage 4 cancer that he made headlines because

15   the cancer never existed.  A new type of cancer.  My mother

16   to the -- my mother dealt with a long, long illness of kidney

17   disease that brought on many other problems, starting with

18   the problems that changed her to the person she wasn't.  My

19   mother went to see a doctor because she was overweight.  And

20   instead of the doctor running medical tests and doing what he

21   was supposed to do, he told her, oh, you need to back away

22   from the table, that's all that's wrong with you.  Here, take

23   these water pills.  Drink water, eat less.  The water pills

24   was -- I'm sorry, not water pills, but some type of steroid.

25   Take these, drink water, eat less.  The steroids was

1  something that made her change to a very angry person.  My
2  mother never abused me before she got on that medication.
3  And not to mention the other decisions she made because she
4  was on that medication, like meeting somebody in a pen pal
5  newspaper one week and two months later moving us about 400,
6  500 miles from Chicago to Vandalia, or actually a small town
7  called Brownstown.  It was so small it wasn't even on a map
8  back then.  Moving us there overnight in a couple month
9  period and marrying a total stranger, where I dealt with more
10  abuse.  I swear I got beat with two-by-fours and wet corn
11  stalks.  And, you know, if you just happened to be walking
12  while Bob was mad, he had the big, long country boots to give
13  you a nice kick right in your anal, you know.  So it was
14  better to just try to stay out of his way because he don't
15  got to be mad at you to catch one of those kicks.  He could
16  be mad because his check didn't come, nobody bought enough
17  wood; or the tree he chopped down fell in the wrong
18  direction.  Or maybe you were expected to have those trees he
19  left cut up.  You got to chop them in one -- one, and you got
20  four pieces, and you got to have them stacked up.  If you
21  didn't have enough stacked up for him to keep the firewood
22  burning because that's what we stayed warm on.

23      We moved a nice -- a nice, beautiful house from
24  1932 Gray in Evanston to a shack in the middle of a cornfield
25  where we had to a burn wood stove all around the clock in the

1    morning time not to freeze. And that was only due to the

2    doctor putting my mom on that medication that damaged the

3    heart, messing with her mind, think she really had an

4    illness, a kidney disease, that needed to be dealt with. And

5    after years, then they -- when they finally found out she had

6    a kidney disease, she went through numerous transplants.

7    That failed six months later. Two transplants she went

8    through. Two heart surgeries. Brain aneurysm, you know.

9    Water on her brain. And when you got -- have surgery and you

10   have to have emergency surgery and you're on blood thinners,

11   you're on blood thinners so -- so you can have dialysis, they

12   don't have that much time to try to get your blood thick.

13   They got to plug an IV and give you the plasma, the stuff

14   that's in the bananas and starch that she normally don't --

15   she can't eat because it thins her blood. But they got to

16   give it to her through blood now to thicken her blood. And

17   after the surgery, because of the stuff she was missing, you

18   know, you don't even recognize the person. She came out like

19   a human balloon. After surgery, she was like 300 was blown

20   into her, 300 pounds of air, you know. But that's all the

21   water that build in her, I think, I don't know. But it's a

22   scary thing to go through, you know, being told that your mom

23   is not even going to make it. But she was the miracle

24   patient, you know. She made it a couple times that they said

25   she wouldn't. And the times you least suspected, she didn't

1 make it.

2 Bottom line is, it's not -- it's not about being --
3 it's not about being sorry I got caught, as Ms. Levin wants
4 to say. No. I am truly and sincere sorry for pain, hurt,
5 misguidance, suffering, anything I've done to anyone, you
6 know. And the only thing, there is only a few things I can
7 do, you know. And that's, one, never, never do the things
8 I've done to anyone else, you know. Get, as Mr. Shaver been
9 telling me, you know, and it's get on the proper medication,
10 as he been telling you I need as well, you know, and if --
11 if -- allow the opportunity to get back in my therapeutic
12 groups. And the number one rule in Narcotics Anonymous,
13 never use again, you know. And the book of Narcotics
14 Anonymous talks about, which is very true, some people don't
15 understand, they misunderstood it, but recovery -- I mean,
16 I'm sorry, relapse is not part of the program. No, relapse
17 is not part of the program. It never will be part of the
18 program. You know, like some people might say, have you had
19 a relapse yet? No, relapse ain't a part of the program.
20 Everybody don't have relapse, but it does happen. Relapse
21 does happen, you know. Relapse in anything happen. You
22 know, even after a surgery, somebody might relapse and report
23 back because they went not following the procedures of you
24 weren't supposed to lift more than 30 pounds for -- you know.
25 You know, regular meetings is the procedure of Narcotics

1  Anonymous through my depression and other -- the mental

2  health issues and -- and family issues in isolating, I

3  relapsed, you know.  As the book says, you know, sometimes we

4  can back ourself into a corner that we might not come out

5  clean.  And that was the corner I backed myself into when I

6  stopped doing everything that was helping me.  Ten years,

7  nine months.  Ten years, nine months.  November.

8  November '95 to June 2006.  When I relapsed and after the

9  fact of relapse, it felt like I woke up in a nightmare.  It

10  was like another person did that drug, not me.  How did I do

11  that?  But I stopped doing everything that helped, that's

12  how.  But if I could do that, ten years and nine months from

13  the age of 23 when I got clean, when I was in the program, it

14  wasn't too many people my age when I was 23 that was staying

15  clean.  I stayed clean for ten years and nine months.  If I

16  did it at 23, I know when I finally, finally get clean again

17  at 38, I can -- I could continue and continue and do it much

18  longer.

19          My biggest stumbling block getting back to the

20  program and getting medicated was the shame of I threw all

21  that, as they call it, good time away.  I pissed it down the

22  drain, you know.  You know, and sometimes shame stop us from

23  doing things that we need to do.  As the book of Narcotics

24  Anonymous say, there is nothing shameful about a relapse.

25  The shameful part is staying out there in the relapse, you

1  know.  I stayed out and the shame got worse and worse

2  because, with the shame, came more and more bad decisions.

3  Right now, today, I stand here clean since 2011.

4  I'm sorry, 2010.  And some people may argue, oh, he is in

5  jail, he don't got a choice.  That's a lie.  People over

6  there getting high every day, every day.  Whether it's weed,

7  heroin, coke, or the stuff that don't show up in the system,

8  they call it tunechi.  I don't want no part of it.  They

9  played a part at ruining my life.  I don't want no part of

10  nothing that played a part in why I'm here today.  No part of

11  drugs.  No part of prostitution.  No part of soliciting.  No

12  part of drinking because I got to be sure about -- be sure

13  and never forget one thing.  For me, alcohol is a drug.  One

14  is wet, the other one is dry.  Bottom line, they both get me

15  high.  If I pick up a bottle, sooner or later, I'm going to

16  end up maybe with a needle in my arm.  People over there

17  cooking up their own wine.  I don't want no part of it.  I

18  want a part in changing, a part in putting back to the

19  community, you know, helping rebuild the community.  This

20  either going to do negative or positive.  I learned, if you

21  don't get involved in something positive, you going to do

22  something negative.  Like, when I got clean, when I got out

23  of treatment and went to the halfway house, I didn't know

24  what to do.  They said, well, do some service work.  I said,

25  I just read something that you got to be six months clean to

1    do service work. He said, the guy that ended up becoming my
2    sponsor, he said, no, you got to be six months clean to chair
3    the table, run a meeting. No, no, the meeting is -- running
4    a meeting is a year clean. But the other stuff like,
5    secretary, GSR, and stuff, six months, you know, he said.
6    But all you need is one day and the willingness to go around
7    and push the chairs in. You know, this is before they passed
8    the new bylaws to make the meeting rooms non-smoking or empty
9    the ashtrays or, you know. And then about after -- I want to
10   say when he gave me my three-month -- no, when he gave me my
11   nine-month medallion, he told me -- you know, I was trying to
12   get a service position and I didn't get voted in. He said --
13   he said, don't be discourage. Really, to tell you the truth,
14   some of the most humbling service, you don't have to get
15   voted in, you know. Pick up a newcomer, take him to a
16   meeting, you know. Give the new person that's walking in the
17   door a hug. The one that, you know, that looks dirty and
18   grimy person that you want to walk away from. Give them a
19   hug. You know, make somebody feel like they belong. Give
20   back what is so freely given to you. And those are the
21   things that help me stay clean. And that guy became my
22   sponsor and helped me stay clean; had me sign up with Grand
23   Prairie Service, help me, you know, to get -- get in the
24   right meetings because I had came from three -- three-month
25   program to the Branden house. I'm seeing TASC probation and

1    my regular probation officer.  And my regular probation

2    officer, he said, okay, you got to get in, you know.  That's

3    part of my mental health probation, I have to get in.  And if

4    you talk to Dave Bishop today, he'll tell you that I'm one --

5    I was one of his success stories.  Before I got locked up, I

6    called Dave Bishop.  You know, when I relapsed, when I

7    relapsed, I called Dave Bishop and broke down and cried, left

8    a message, told him I messed up.  And before I got locked up,

9    about a month or so before I got locked up, I called Dave

10   Bishop and told him, you know, I wanted to let you know that

11   I'm clean.  At that time I had I think about 18 months clean,

12   you know.  I said, I'm clean.  I know I left a message on

13   your recording one day and I was messed up.  And I said --

14   then it turned out he had never got the message.  So I might

15   have deleted it because it gives you the option to send or

16   delete.  But it was good to let him know I was clean.  And I

17   reached out to him, you know.  And, you know, and I know

18   how -- when I'm on the right track and I'm medicated, I know

19   how to reach out, you know.  You know, I have my network.  I

20   have 800 numbers.

21        You know, Ms. Levin is talking about life in

22   prison, you know, and to protect society, and I -- and I

23   understand it's important to protect society.  But I truly,

24   honest to God, do not believe that society need to be

25   protected from me.  You know, I understand I made some real

1   bad mistakes in -- in life.  However, the thing about -- I
2   don't even think she is even qualified to determine what type
3   of person I can be moving forward.  But I think my past
4   speaks for itself of what type of person I can be, you know.
5   From 10 years and nine months that I was clean and on
6   medication, what do you see in my background?  Nothing.
7            THE COURT:  There were numerous arrests for assault
8   during that time.
9            THE DEFENDANT:  I forgot about that.  I was
10  arrested for -- it was assault.  Someone claiming they was
11  battered.  It was a guy from one of the meetings, and he
12  claimed I battered him.
13           THE COURT:  I think one of them was your stepson.
14           THE DEFENDANT:  Pardon?  No, I never been arrested
15  for assault on my stepson.
16           THE COURT:  Well, you weren't convicted.
17           THE DEFENDANT:  And that was something that was
18  claimed throughout bond and throughout trial.  I never
19  been -- Oh, I'm sorry, I did have that, too.  But, and that
20  was thrown out, too.  That was in --
21           THE COURT:  I agree, there were no convictions.
22  Okay.  I think --
23           THE DEFENDANT:  But for the gist of it, what I'm
24  saying is, if you look at my background, you see, when I used
25  drugs, I had patterns.  Patterns maybe that lasted every

1    three months.  I'm arrested for something, whatever it is.

2    Domestic.  A domestic, disorderly conduct, you know,

3    possession, you know.  From 2000 -- or from '95 to 2006, you

4    don't see that pattern.  Something changed.  So when you --

5    when you ask yourself, the pattern was broken, what changed,

6    I'm letting you know what changed in my life.  I had help.  I

7    had help.  I was properly medicated, you know.  Maybe --

8    maybe not even properly, but I was -- I had a doctor that

9    didn't really want to mess with my psych meds because I had

10   thyroid issues.  I been going back and forth to the hospital

11   for thyroid issues since 2000.  Since 2000 and -- and they

12   don't -- when you going through thyroid issues, they don't

13   want to mess with your psych meds because your thyroid glands

14   control every single thing in your body, you know, from

15   mental health issues to even nerve issues.  And it's -- you

16   know, it gets real deep how much the thyroid control, you

17   know.  And it took years to get this thyroid dealt with.  One

18   minute I'm on medication, one minute the doctor calling me,

19   don't take no more, you're too high, you're too low.  I'm

20   being sent from one specialist to another, you know.  And

21   then there was times where I just stopped taking the meds

22   and, you know, I -- I was using.  You know, I was battling

23   back and forth with the demons that -- of the drugs, you

24   know.  From 2006 to '10 was a real battle back and forth, you

25   know.  I think I went -- went to three -- I went to the

1  hospital three, four times from 2006 to '10, and two of them
2  being a drug rehab.  And -- and then I left Linden Oaks at
3  one time and was sent to a nursing home for mental illness
4  because I wasn't discharged stable.  I wasn't stable.  They
5  just -- my insurance ran up and they sent me to a nursing
6  home, Sunset.  It was called Sunset on Sheridan, on the north
7  side of Chicago.  And I was eventually discharged from the
8  nursing home at a hospital.  When they took me to the
9  hospital from Sunset, I had a bipolar episode, and they sent
10 me to the hospital and they refused to take me back at --
11 Summerset, not Sunset.  It was called Summerset.  They
12 refused to take me back at Summerset because of my bipolar
13 episode.  You know, I had put a couple cigarettes out on
14 myself where, in order for me to go have a cigarette, I had
15 to be on one on one.  You know, I had to have counselor with
16 me anytime I wanted a cigarette, you know, because I kept
17 putting out cigarette out on myself.  And then -- then a
18 couple bipolar episodes where they had to restrain me and
19 medicate me, you know.  And -- and they discharged me from
20 that hospital.  They had taken me to the hospital.  They sent
21 me back, you know, and I got discharged from there, didn't
22 know where to go.  North side of Chicago, you know.  It only
23 take a second to get further south or west, you know.  And
24 I'm over somebody's house getting high, you know.  You know,
25 many times feeling rejected, I don't want it, you know.

1            And I felt all my life I felt rejected by my dad,

2    waiting at the window, rejected by my mom when it seemed that

3    she chose a pen pal stranger over her kids.  Rejected by the

4    hospital when they say they can't help me.  When I got

5    expelled out of school and my mom took me to therapist.  A

6    rejection that the therapist said there is no help for him.

7    When you go to see a medical doctor and they lie and say

8    there is no help, you know how belittling that is?

9            But these are things I just added to my

10   self-medicating list.  I'll get high and forget about it.

11   But the truth of the matter, high don't get -- getting high

12   don't take no pain away.  It gives you an illusion that it's

13   gone for a minute.  As soon as the high goes away, the pain

14   comes tumbling down ten times worse.  And I've learned over

15   the years the only thing that ease the pain, because pain is

16   never going to go away, that eases the pain is to confront

17   the pain.  Deal with it, you know.  So working the steps in

18   the Narcotics Anonymous meeting, you got your anger category,

19   you got your rejection category, you got your -- you got your

20   abuse category, you got your resentment.  I resent this, I

21   resent that.  And sometimes you look up.  And when you keep

22   on riding over the years, you look up and you -- then you

23   resent things that, like, where did this come from?  Even the

24   perfect stranger.  But when you get deep down from under the

25   surface stuff, you resent the perfect stranger because he

1 reminded you of Bob that did this to you or dad that did this

2 to your mother; or the list go on. But then, when you get to

3 the nitty-gritty, you got to get to the forgiveness category,

4 including forgiving yourself, you know. And sometimes, I'm

5 not going to say sometimes, a lot of times, it seems easier

6 to forgive somebody else than yourself, you know. I'm mad at

7 myself the most. But you learn forgiveness. True

8 forgiveness start with self. You got to truly forgive

9 yourself before you can forgive others. Then you can get

10 closure and move forward, you know. And these are the tools

11 that I have instilled in me that, with the chance, I can -- I

12 regain these tools. I can use them. I can use them. And I

13 can help someone else use them where they don't have to go

14 down some path. I can stop somebody else from falling in the

15 pothole I fell in. There is another me sitting in the

16 meeting right now that needs somebody to reach out to him and

17 tell me he is not that bad person, he made bad decisions, and

18 we're going to love you until you learn how to love yourself;

19 and then you can give it back to somebody else and we're

20 going to do this together. Everything you've been through or

21 going through, I've been through it. That is okay. That it

22 might get worse before it gets better, but it's going to get

23 better, you know. There is somebody else that needs tools

24 that's instilled in me that I can put in to them that they

25 don't end up in front of you or no other judge under any

1    other circumstances.

2              One thing I've learned in this four years, besides
3    learning that the jails are so overcrowded, it's overcrowded
4    with people with mental illness.  This guy, Angel Ramos, rest
5    his soul, guy just died a couple days, right there, in the
6    cell across from me.  Mental illness.  And people with mental
7    illness end up in the SHU or Seg and neglected and left
8    behind.  You know, a lot of times, you know, oh, he just got
9    mental illness.  That's why he is not getting up.  Don't
10   worry.  He don't want the breakfast?  He don't want the
11   lunch?  He don't want the dinner?  Until the right CO that's
12   caring and loving come by.  Oh, no, why he is not getting up.

13             THE COURT:  All right.  I don't think we need to
14   talk anymore about him.

15             THE DEFENDANT:  Okay.  I'm sorry.

16             THE COURT:  I need you to finish a point or -- it
17   has been a long time.

18             THE DEFENDANT:  I'm sorry.  I'm just trying to
19   express my feelings and views.  But, again, I stand before
20   you and I'm begging for mercy.  And I think Count 1 doesn't
21   limit how much probation you can give me.  If you give me a
22   chance, I can be the miracle defendant that stood in front of
23   you and turned things around and helped to contribute to
24   society.  I stand before you today begging for mercy.

25             THE COURT:  Thank you.  All right.  Let's turn to

1   3553.  Starting with an Offense Level of 43 because I guess

2   is the highest level it can go, and a Criminal History

3   Category of III.  The guideline provision is life

4   imprisonment, but it is not a requirement.

5          Well, we start with looking at the nature and

6   circumstances of the offense.  And it's hard to really talk

7   about or really to describe, I mean, as the government was

8   saying, that the seriousness of the offense in terms of the

9   viciousness of it and the harm that it did.  I mean, this was

10  several years of trafficking.  This was involving the four

11  victims that testified before me, as well as the -- I mean,

12  the five before involving counts and the additional one in

13  terms of relevant conduct.  They were kidnaped in the sense

14  that they were not allowed to leave.  They were tortured.

15  They were coerced.  They were forced to engage in

16  prostitution.  They were humiliated.  They were repeatedly

17  raped.

18         The other part of 3553(a)(1) is the history and

19  characteristics of the defendant.  In some ways, certainly

20  this criminal history category does not overstate his

21  offenses.  I have listened, I've read your very good

22  memorandum, listened to your argument, Mr. Shaver; and I have

23  listened as well, I have for a very long time now, to

24  Mr. Carson.  And, of course, I have watched him both in trial

25  and in court over a period of several years and many times.

1    You are smart and manipulative and incredibly self-centered.
2    I just listened to you for an hour and a half, or however
3    long it was, and I never heard any remorse, any
4    understanding, any -- -- anything whatsoever that said, I
5    know I really hurt these people, and I am sorry for that.
6    What I heard was:  Poor me.  I was victimized by my mother, I
7    was victimized by my father, I was victimized by every
8    medical person who has had any contact with me.  I was
9    victimized by teachers; everyone, apparently, who has come
10   into your life.  And I also heard you say that, okay, you
11   acted better during the years when you weren't drugging.  If
12   so, you had an option.  You had the option not to go back to
13   it.  I do notice that, when you say you quit your drugs again
14   in early 2010, that the conduct in this case went on after
15   that.  And, oh, your wife's fault.  I left that one out.

16          I do see that there is a history of mental health
17   issues.  I think we've been very careful in this case to make
18   sure -- to try and separate and make sure what was going on.
19   Sometimes it was, I think you decided not, just as you
20   decided to stop taking your medication back at times when you
21   were out, you stopped taking your medication when you were
22   incarcerated.  Undoubtedly -- there is nobody -- I don't
23   think anybody grows up to be an abuser in the way that you
24   were an abuser without probably being abused at some level
25   himself; or I suppose it could be herself.  But that doesn't

1    excuse what you did.  And it doesn't excuse you from at some

2    point taking responsibility, real responsibility, and saying:

3    Gee, I really, really hurt these people.  But I will take it

4    into consideration in a sentence.

5          The sentence is supposed to reflect the seriousness

6    of the offense, promote respect for the law and provide just

7    punishment, as well as adequate deterrence; and to protect

8    the public from further crimes of the defendant.  I

9    usually -- in most cases, I'm actually not that worried about

10   further crimes.  I am in this case.  I see no sense

11   whatsoever that whatever has fueled this is not still there,

12   will not be there.  I also see somebody who can talk well,

13   who may not have had a lot of education.  Although, it does

14   say you went to high school part of the time.  But is quite

15   smart and quite capable of discerning a whole bunch through

16   lots and lots of facts.  And I can see at talking vulnerable

17   people into going with them.

18         So taking all of that into consideration, as well

19   as the need for just punishment, the need to really punish

20   just really severe crimes and the other factors, but also

21   hoping that if any help is given in prison that there might

22   be a chance some day that you could be released and not cause

23   harm, I'm committing you to the custody of the Bureau of

24   Prisons for a term of 47 months -- 47 years on Counts 1, 2, 3

25   and 4, to be served concurrently.  47 years.  There will be a

1  fine.   There is a special assessment of $400 payable

2  forthwith.

3  Upon your release from prison you will be on

4  supervised release for a term of five years on Counts 1, 2,

5  3, and 4, to be served concurrently.  Within 72 hours of your

6  release from the custody of the Bureau of Prisons, you shall

7  report in person to the probation office in the district to

8  which you are released.  On supervised release, you shall not

9  commit another Federal, state or local crime.  You shall

10  comply with the standard conditions adopted by the Court.

11  You shall refrain from any unlawful use of a controlled

12  substance.  You shall submit to one drug test within 15 days

13  of release from prison and random drug tests thereafter, not

14  to exceed 104 tests per year.  You shall cooperate with the

15  collection of the DNA sample at the direction of the

16  probation officer.  You shall participate in a mental health

17  treatment program at the direction of the probation officer.

18  You shall comply with all recommended treatment.  That may

19  include psychological and physiological testing.  You shall

20  maintain use of all prescribed medication.  You shall

21  registered with the state sex offender registration agency in

22  any state where you reside, employed, are employed, carry on

23  a vocation or are a student.  You shall not have contact with

24  any person under the age of 18 except in the presence of a

25  responsible adult who is aware of the nature of your

1  background and current offense and who has been approved by

2  the probation officer and treatment provider.

3          I think that's all.  I don't actually have one of

4  those little up-to-date -- this was done so long ago.  I

5  think that ought to cover -- you have one?  I don't think one

6  was done in this case.

7          MS. LEVIN:  Oh, then I don't.

8          THE COURT:  Did you do one?

9          PROBATION OFFICER:  No, your Honor, I did not.  I

10  have --

11          THE COURT:  Well, I think I've covered the ones

12  that would seem to me to be important, considering his age,

13  by the time he will be released.

14          PROBATION OFFICER:  Very well, your Honor.  I mean,

15  we typically recommend, one of them statutory, it's No. 8,

16  under the special conditions, I think.  Refrain from

17  possessing a firearm or destructive device.

18          THE COURT:  Yes, we should do that.

19          PROBATION OFFICER:  Then there is a cluster of them

20  routinely asked for every case.  Remain in this jurisdiction

21  where he is released and being supervised.

22          THE COURT:  Yes.

23          PROBATION OFFICER:  Don't leave without permission

24  of the Court or probation officer.  Report to the probation

25  officer or Court as directed.  Permit the probation officer

1 to visit the defendant at his home, work or any other

2 reasonable location; and permit the confiscation of any

3 contraband observed. Notify the probation officer promptly

4 of any change in residence. Notify the probation officer

5 promptly within 72 hours if arrested or questioned by law

6 enforcement. So those are the standard.

7 THE COURT: Do you have any objection to any of

8 those?

9 MR. SHAVER: I do not, Judge.

10 THE COURT: They all sound appropriate. Okay. We

11 will include -- we will include those.

12 You have 14 days to file a notice of appeal. Is

13 there any place you want me to recommend where he serves his

14 sentence?

15 MR. SHAVER: The medical facility in Minnesota I

16 think would be the best place for him. We haven't talked

17 about it, and I don't know if he wishes a place that's closer

18 to home, but he needs psychological counseling. He needs

19 medical help -- a mental health treatment.

20 THE DEFENDANT: Excuse me, your Honor. There is no

21 medical center down south where the majority of my family is.

22 My sisters will have to relocate down there as well. My

23 brother is in --

24 THE COURT: I'll tell you what, it will take her a

25 little while to get this prepared. You people -- well, I

1  don't know, do you want to talk about it a little bit?  Do

2  you want the list?

3            MR. SHAVER:  There is a medical facility in

4  St. Louis, Missouri, but that is as close as it is farther

5  south, but --

6            THE COURT:  Do you want me to just recommend that

7  he be sent to an appropriate facility in Georgia?  Is that

8  what you're saying?

9            THE DEFENDANT:  In Georgia, Arkansas, in that area.

10  If you got a medical center, if you got one.

11            THE COURT:  There is one in -- I mean, I'm not --

12  you know, they will have to decide whether --

13            MR. SHAVER:  Yes.

14            THE COURT:  -- what kind of treatment is

15  appropriate.  But I will recommend that he go to an

16  appropriate -- whatever is the appropriate facility in

17  Georgia, Arkansas or Missouri.  Is that what you said?  You

18  didn't --

19            THE DEFENDANT:  No.  Alabama, Arkansas.

20  Prattville, Alabama; Conyers, Georgia; and in Arkansas;

21  right?  Yeah, Little Rock.  Arkansas.

22            THE COURT:  Where is your sister moving?

23            THE DEFENDANT:  My sister, she is moving that way,

24  too, where my brother is, towards my brother.  She don't know

25  exactly where, so.

1    THE COURT:  Where does he live?

2    THE DEFENDANT:  He lives in Georgia.  He lives in

3    Conyers, Georgia.

4    THE COURT:  All right.  We'll say Georgia,

5    Arkansas, Alabama.  Anything else?

6    MS. LEVIN:  Just one issue from the government,

7    Judge.  The government is seeking restitution for the victims

8    that were charged in the indictment in this case.  It's based

9    on their trial testimony.  I have a chart that I can provide

10   to your courtroom deputy.  It's based upon the number of days

11   that they worked and an average amount that they made each

12   day.

13   MR. SHAVER:  I would object, Judge.

14   THE COURT:  I'm not going to do that.

15   MS. LEVIN:  Under the statute, Judge, they're

16   entitled to -- I mean, restitution is mandatory.

17   THE COURT:  But it's restitution of funds.  They

18   actually were engaged in illegal conduct; right?

19   MS. LEVIN:  Yes.  And the courts have held that

20   it's appropriate to order restitution in cases like these

21   where they were entitled to the funds and the funds went to

22   the person who was trafficking.

23   THE COURT:  Have you given them this chart?  I

24   haven't seen this.

25   MS. LEVIN:  I haven't -- we just put it together.

1    It was -- I wrote about restitution in the government

2    sentencing memo, though, Judge, and said that I would be

3    providing a copy at sentencing.

4           MR. SHAVER:  Judge, I have seen some restitution

5    orders that are tied directly to treatment, counseling,

6    medical treatment, but there are bills.  And there should be

7    an accountability of what was spent and what supposedly is

8    owed.  But I think it's too speculative and is inappropriate

9    in this case.

10           THE COURT:  Well, right now you're asking me to

11    look at something I haven't even -- do something based on

12    something I haven't even seen.

13           MS. LEVIN:  Yes.  Judge, as I said, it's based on

14    the trial testimony.  And if your Honor would, like while

15    your courtroom deputy is putting together the judgment of

16    commitment order, I can certainly --

17           THE COURT:  Well, she is probably not going to get

18    that done today.

19           MS. LEVIN:  So I can certainly submit something

20    more in writing and submit the attached chart and your Honor

21    can rule.

22           THE COURT:  Do you have the chart now?

23           MS. LEVIN:  And, Judge, I'm passing up one more

24    that actually is more detailed that I just received.

25           THE COURT:  You know --

1            MR. SHAVER: I note that Judge Leinenweber did not

2   order restitution in the case.

3            THE COURT: You've also had a lot of time to have

4   done this so that we could deal with it today. I don't want

5   to deal with this after today. I'm not going to do it then.

6   I have no idea what this is based on. Ordinarily, if we had

7   a restitution issue, we would have dealt with it before the

8   day of sentencing, not at the very -- not at 4:00 o'clock on

9   this afternoon, after an entire day, or almost an entire day.

10   And I have no idea what these numbers mean.

11            MS. LEVIN: Judge --

12            THE COURT: Have you given this to Mr. Shaver

13   before then?

14            MS. LEVIN: It was just prepared today, Judge, and

15   it has been -- but it's information that has been available

16   because it's in the trial transcripts that I received from

17   Mr. Shaver. I mean, none of this is new. It's based on the

18   time period that they testified that the defendant trafficked

19   them. And it's based on the average amount of money that was

20   also in the record that they would make each day. So, I

21   mean, all of this information is available. And of course --

22            MR. SHAVER: We're paying them for the trial

23   testimony?

24            MS. LEVIN: I'm sorry.

25            MR. SHAVER: I'm sorry.

1    MS. LEVIN:  And as far as putting defense counsel

2  on notice, we mentioned this in our government's version.  We

3  also put it in our sentencing memorandum.  So it shouldn't be

4  a shock to anybody that the government is seeking this

5  restitution.  And we cited cases that support providing

6  restitution to victims of sex trafficking in similar

7  circumstances where it has been awarded, based upon the

8  services that the victims provided when the money went to the

9  trafficker.

10    MR. SHAVER:  They have not provided in paper the

11  specifics of what was done in this case that deserves

12  restitution.  They simply haven't.  If the only restitution

13  is based on the funds that were paid for the sex acts in the

14  case, how many sex acts were there?  Estimates?  Is that an

15  appropriate estimate for a restitution?  I don't think so.

16    MS. LEVIN:  Based on the testimony that was given

17  under oath and the jury found them credible and there is no

18  evidence to the contrary, yes, it actually is, Judge, because

19  it's confined to the period that they testified they were

20  trafficked, based upon working every single day.  And it is a

21  very moderate estimate of $500 a day.  And there was

22  testimony regarding the prices that were charged for each of

23  the sex acts.  I have a copy, Judge.  Would you like --

24    THE COURT:  Yeah, I would like to see it.

25    THE DEFENDANT:  Your Honor, while you're waiting on

1    that, two quick things, please. We never dealt with the

2    forfeiture thing. I'm willing to waive the forfeiture thing,

3    but the Federal agents took a computer of my mom's that was

4    not used in trial, has no -- was no part of the case

5    whatsoever, got all our family pictures on that my aunt would

6    like back. And it's a whole bunch of family irreplaceable

7    pictures that --

8           THE COURT: Did you hear him?

9           THE DEFENDANT: That even affected them having the

10    proper pictures for my mom's obituary, you know, that we've

11    been trying to get back for years.

12           MS. LEVIN: Judge, it has previously been returned

13    to the defendant's sister.

14           THE DEFENDANT: No, it hasn't, your Honor. We've

15    been asking about this for long. Is there a receipt that

16    you -- that it has been returned to my sister?

17           MS. LEVIN: Yes, Judge. And we can certainly

18    provide it to defense counsel.

19           THE COURT: All right.

20           THE DEFENDANT: Okay.

21           THE COURT: Well, it did say you would submit a

22    victim information sheet for restitution in advance of

23    sentencing. And you don't cite any Seventh Circuit cases.

24           MS. LEVIN: That is true, there is no Seventh

25    Circuit case cited there.

1    THE COURT:  I guess, without anything being

2  submitted, I didn't have any reason to really look into it.

3  Okay.  I don't think there is going to be any money, so I

4  think we're spending additional time in a too warm courtroom

5  for something that isn't going to be very useful.  But I'm

6  not going to order restitution based on something that I was

7  just given now.  And this is the end of this case.  You

8  wanted to go to sentencing today, we did.  All right.  Thank

9  you.

10    MR. SHAVER:  Thank you, Judge.

11    THE CLERK:  All rise.

12    (Which were all the proceedings heard.)

13    CERTIFICATE

14    I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16  */s/Sandra M. Tennis*                    *January 4, 2016*

17  _____         _____

18  Sandra M. Tennis                        Date
   Official Court Reporter

19

20

21

22

23

24

25